120 A.3d 155

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. DONTAE
HATHAWAY, DEFENDANT–RESPONDENT.

Argued February 2, 2015—Decided August 4, 2015.

456

*Frank Muroski,* Deputy Attorney General, argued the cause for appellant (*John J. Hoffman,* Acting Attorney General of New Jersey, attorney).

*Melissa Rosenblum–Pisetzner* argued the cause for respondent (*Law Offices of Joseph A. Levin,* attorney).

Justice ALBIN delivered the opinion of the Court.

In this appeal, we must determine whether the warrantless search of a room in a casino hotel, where the police reasonably believed an armed robbery had recently occurred, violated the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution. Fearing that another victim or victims might be injured or held hostage in the room, and that time was of the essence, heavily armed police entered the room when no one answered the door. After entry, the police observed in plain view a gun inside an open duffel bag. The room was empty, and the weapon was secured as evidence. The hotel room was registered to defendant Dontae Hathaway, who later was charged with second-degree unlawful possession of a weapon, contrary to *N.J.S.A.* 2C:39–5(b).

Defendant moved to suppress the gun, claiming that its discovery was the product of an unconstitutional search. After a hearing, the trial court suppressed the weapon, finding that the police did not possess probable cause or exigent circumstances to justify a warrantless entry and search of the hotel room. The Appellate Division affirmed.

We now reverse. Responding to an armed robbery at a hotel, the police faced a potentially volatile and dangerous situation—a suspected gunman on the loose who may have injured or was

presently threatening other patrons or staff. The officers did not have time for a fact-gathering process suitable to a trial or for sustained reflection or deliberation. The perilous and exigent circumstances required prompt action based on the credible information at hand.

We conclude that the trial court erred by viewing the events through the distorting lens of hindsight rather than viewing those events as they appeared to an objectively reasonable police officer who had to make immediate decisions in the face of a credible threat to the safety and lives of others. Based on the evidence presented at the suppression hearing, the police acted within the scope of the emergency-aid exception to the warrant requirement. Accordingly, the gun should not have been suppressed based on the evidence presented by the State.

We remand to the trial court for further proceedings. Because the trial court determined that the State had not sustained its burden after its presentation, the defense was not given the opportunity to call subpoenaed witnesses. At a new hearing, the trial court must consider all evidence presented in deciding the merits of the suppression motion.

## I.

### A.

Defendant was charged in an indictment with second-degree unlawful possession of a firearm, *N.J.S.A.* 2C:39-5(b).

At the suppression hearing, the State called one witness, Officer James Armstrong, a seventeen-year veteran of the Atlantic City Police Department. In the early morning of March 28, 2012, Officer Armstrong was working "a special employment detail" in the Taj Mahal Hotel and Casino.[1] The record before us consists

---

[1] The casino hires police officers to provide additional security on the premises. The officers hired for such purposes are deemed to be on "a special employment detail."

of his testimony, videotape surveillance taken by hotel security cameras, and a photograph of the gun inside a duffel bag.

Around 4:00 a.m. on March 28, a casino security officer radioed Officer Armstrong, requesting that he come to the "security podium" in the casino. There, Armstrong met with several security officers, including supervisor Angel Ramos. Officer Armstrong was told that "a white male" approached the security podium and reported that he had been robbed of $400 in cash at gunpoint by two black males in dark clothing in a room on the hotel's 70th floor. The hotel patron also said that he was forced to undress during the robbery. Forcing a victim to undress, explained Armstrong, is a tactic that allows robbers to facilitate their getaway.

The security officers described the victim as "animated" and "upset" and told Officer Armstrong that they found him credible based on their experiences with other victims "robbed at gunpoint." However, several minutes after reporting the crime, the victim departed. In Officer Armstrong's experience, it was not uncommon for a victim to leave after reporting a crime, particularly if the victim was involved in some embarrassing (if not illicit) activity, such as prostitution. The victim's name was never discovered, although his identity was recorded by multiple surveillance cameras.

Based on the information provided to him, Officer Armstrong asked the security team to contact the hotel's surveillance department to review the video footage to confirm the details of the victim's report. Security Officer Ramos radioed the surveillance room and gave directions to guide the review of the video footage. While waiting to hear from the surveillance department, Officer Armstrong called for the Atlantic City Police Department's special weapons and tactics (SWAT) team. Because he feared that an armed gunman might be on the 70th floor, Officer Armstrong believed he did not have time to walk ten to fifteen minutes to the building housing the surveillance department and personally review the video footage.

About five minutes after Armstrong's call for backup, a four-member SWAT team arrived at the Taj Mahal. Immediately before the team's arrival, casino security personnel relayed to Officer Armstrong that the surveillance footage confirmed that the victim, who reported the robbery at the security podium, was observed on an elevator with a white male, a black male, and two females that stopped on the 70th floor.[2] Officer Armstrong was told that the five individuals then proceeded to Room 7023, and sometime afterwards, the victim left the room quickly in what appeared to be a panic. When the victim reached the elevator, he frantically looked over his shoulder toward the hotel room as though "something had happened" and pushed the elevator buttons. Based on the surveillance department's five-minute review of the video footage, security conveyed to Officer Armstrong that perhaps two or more people remained in the room.[3] The surveillance department could not account for all those who entered the room.

Officer Armstrong believed that he was "working against time." He did not know whether there was an armed gunman roaming the casino or a hotel floor, or "barricaded" in the room on the 70th floor. He did not know if there was a hostage in the room or a victim "tied up and gagged" or possibly shot.

Officer Armstrong and the four-member SWAT team, along with Ramos and other casino security officers, proceeded to the 70th floor and set themselves up outside of Room 7023. Security then telephoned inside the room several times, but no one answered. As the officers drew closer to Room 7023, they realized that the door was "slightly cracked" open, "as if someone had left

---

[2] Officer Armstrong corrected his initial testimony that security told him that there were two black males and a white female on the elevator.

[3] At the hearing, some confusion arose from the fact that, at some later point, Officer Armstrong reviewed the surveillance footage. The testimony presented in the narrative is based on the information that Armstrong knew at the time of the incident.

in a hurry." A light was on in the room, but the officers could not see inside. Officer Armstrong called into the room, but there was no response. He was uncertain whether someone inside might be tied up, wounded, or unconscious and whether a gunman might possibly be there.

The officers then jammed the door open and called into the room, again with no response. From their vantage point, they could see partially into the room, catching sight of two beds. But they could not observe the room's far-right corner or inside the bathroom or closet. The officers entered the room with guns drawn. They checked the room for victims or a gunman but found no one there. They did observe, however, on a cabinet by a bed, a "wide open" duffel bag containing an automatic black Beretta handgun. The handgun was readily visible. Also inside the bag were a municipal court subpoena and a medical bill issued to defendant Dontae Hathaway.

Taj Mahal security determined that the room was registered to defendant. Around noon that same day, defendant was arrested when he returned to the room.

The State rested after Officer Armstrong's testimony. The trial court reviewed relevant surveillance video from the Taj Mahal and a photograph of the duffel bag. The video has a playing time of approximately one hour and thirteen minutes and consists of footage from a number of surveillance cameras that recorded events at the security podium, inside the elevator, and on the 70th floor. Thirty-five minutes of surveillance footage covers the period between the time the victim entered the elevator on his way to the 70th floor until the police entered Room 7023.

## B.

Defense counsel subpoenaed security personnel from the Taj Mahal and officers from the Atlantic City Police Department, but none of the subpoenaed witnesses appeared at the hearing. However, based on the State's presentation alone, the trial court determined that the State failed to meet its burden of establishing

probable cause or exigent circumstances to justify the warrantless entry and search of the hotel room. The court, therefore, granted the defense motion to suppress, making the missing defense witnesses a non-issue.

The court gave its reasons for granting the suppression motion: (1) the report from the purported victim was unreliable because he refused to identify himself; (2) Officer Armstrong relied on hearsay—the victim's report of the robbery and the surveillance department's review of the video footage—filtered through untrained security personnel; and (3) Officer Armstrong should have walked over to the surveillance department and reviewed the video himself before taking action. According to the court, its independent review of the hour-long surveillance video, consisting of more than 100 individual clips, revealed inconsistencies between the video footage and information conveyed to Officer Armstrong. For example, the court's review of the video disclosed that three males left Room 7023 together, including the victim who was smoking a cigarette and who did not appear to be in a panic. The court also rejected, on "common sense" grounds, Officer Armstrong's conclusion that a gunman or hostages might have been in Room 7023, given that the door was not locked and the surveillance tape showed no persons in the hallway. By the court's reasoning, the police should have suspected that the person who left the door ajar went on some errand, such as "to get a bucket of ice," and "was about ready to come back."

The court determined that the police officers did not have "probable cause" or "a reasonable suspicion or articulable belief" to conclude that there was an ongoing crime or victims in the room. Additionally, the court found that no exigency excused the failure of the officers to apply for a search warrant. The court believed that "a telephonic search warrant could have been obtained within maybe half an hour, more than enough time for the police to secure the room." Accordingly, the court suppressed the gun.

The State filed an interlocutory appeal.

C.

The Appellate Division granted the State's motion for leave to appeal and, in an unpublished opinion, affirmed the trial court's suppression of the gun. The appellate panel found that the "unverified information reported by the alleged victim [was] not ... sufficient to establish probable cause to support the warrantless search" of the hotel room. The panel emphasized that the "credibility and reliability" of the victim reporting the robbery was "completely unknown" and that Officer Armstrong failed to corroborate the tip. The panel pointed out that "Armstrong did not personally review the videotape, but instead relied on a description of its contents by casino hotel surveillance personnel, who in turn relayed their version to the security guard." It also determined that "the actual events depicted on the videotape ultimately prove the surveillance department's account to be less than accurate" and "even that version failed to verify any criminal wrongdoing."

The panel also upheld the trial court's finding that the State did not "demonstrate exigent circumstances justifying the warrantless entry into the hotel room." The panel determined that "the police had no reliable information that a gun was probably located in Room 7023"; that "it was likely that the room was empty," given that "the door was ajar [and] no one responded to any of the officers' calls"; and the police could have "secured the hotel room while making an application for a telephonic warrant, given the extant circumstances and the number of police present."

The panel concluded that "[a]bsent both probable cause and exigent circumstances, the search of the hotel room was constitutionally impermissible."

We granted the State's motion for leave to appeal. *State v. Hathaway*, 217 *N.J.* 289, 88 *A.*3d 187 (2014).

II.

A.

The State urges this Court to reverse the Appellate Division and to find that "the police entry of the hotel room was reasonable

under either the emergency-aid doctrine or a straightforward application of the exigent-circumstances test." The State argues that the panel's decision has cast doubt on police practices that are supported by well-established precedent. According to the State, the panel erred (1) in dismissing "the victim-eyewitness report, which was relayed in person, as nothing more than an anonymous tip"; (2) in placing "undue weight on the absence of criminal activity on the video without giving any weight to the significant [video] corroboration . . . of the victim's presence and demeanor"; (3) in faulting Officer Armstrong for relying on casino security officers, who relayed to him the victim's report of the armed robbery, and the surveillance department's review of the video footage; (4) in downplaying the fact that Officer Armstrong was responding to an ongoing emergency of "armed criminals in the hotel"; and (5) in accepting both the trial court's "unsupported estimate that a telephonic warrant could have been obtained within a half-hour" and its assumption that waiting such a period would not have endangered patrons, staff, or helpless victims. The State's main contention is that, under the emergency-aid doctrine, the police officers had an objectively reasonable basis to believe that their immediate entry into the hotel room was necessary to protect life or prevent serious bodily injury.

### B.

Defendant argues that the police possessed "no evidence that any criminal activity" had occurred or was ongoing at the Taj Mahal, and on that basis the trial court and Appellate Division properly concluded that the police lacked not only probable cause or reasonable suspicion, but also exigent circumstances to enter and search the hotel room without a warrant. More specifically, defendant contends that the warrantless entry and search violated the Federal and State Constitutions because (1) "information from an unknown individual is not different than the police receiving information from an anonymous tip"; (2) the "third hand information" conveyed to Officer Armstrong merely confirmed that the

unknown complainant was on the 70th floor with two other males and two females; (3) the State presented "no evidence that the hotel security officers and surveillance department received any training in investigating crimes"; (4) the police did not "view the [surveillance] video and attempt to corroborate any information received from the third-party hotel security"; and (5) the State presented "no evidence of an immediate and/or ongoing threat to public safety." Defendant maintains that this Court should decline to consider the emergency-aid doctrine, which was raised for the first time by the State in the appeal to this Court. On the merits, defendant claims that the doctrine is inapplicable because there was not an objectively reasonable basis to believe that an emergency required the warrantless entry into the hotel room.

### III.

### A.

We must determine whether the search of defendant's hotel room comported with the dictates of both the Federal and State Constitutions. Essential to that determination are two intertwined issues: whether the trial court applied the proper legal principles governing our search-and-seizure jurisprudence and whether its findings of fact are supported by the record.

In resolving those issues, we begin with our standard of review. We owe no deference to a trial or appellate court's interpretation of the law, and therefore our review of legal matters is de novo. *State v. Vargas*, 213 *N.J.* 301, 327, 63 *A.*3d 175 (2013). In contrast, a trial court's factual findings are entitled to deference. *State v. Elders*, 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007). We must uphold a trial court's factual findings at a motion-to-suppress hearing when they are supported by sufficient credible evidence in the record. *Ibid.* However, deference is not required when factual findings are clearly mistaken. *Ibid.*

With those canons in mind, we begin with a review of the constitutional principles that apply to this case.

## B.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in nearly identical language, guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and no Warrants shall issue, but upon probable cause." *U.S. Const.* amend. IV; *see also N.J. Const.* art. I, ¶ 7. Under our constitutional jurisprudence, when it is practicable to do so, the police are generally required to secure a warrant before conducting a search of certain places, *State v. Pena–Flores,* 198 *N.J.* 6, 23, 965 *A.*2d 114 (2009), such as a hotel room, *Stoner v. California,* 376 *U.S.* 483, 486, 84 *S.Ct.* 889, 891, 11 *L.Ed.*2d 856, 859 (1964). Indeed, "[a] search conducted without a warrant is presumptively invalid." *State v. Frankel,* 179 *N.J.* 586, 598, 847 *A.*2d 561, *cert. denied,* 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.*2d 128 (2004). For that reason, "the burden falls on the State to demonstrate that [a warrantless] search is justified by one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." *Ibid.* (quoting *Mincey v. Arizona,* 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.*2d 290, 298–99 (1978)). One such exception to the warrant requirement is the exigent-circumstances doctrine, *State v. Cassidy,* 179 *N.J.* 150, 160, 843 *A.*2d 1132 (2004), and another is the emergency-aid doctrine, *Frankel, supra,* 179 *N.J.* at 598, 847 *A.*2d 561.

Both the trial court and Appellate Division directed their attention to the exigent-circumstances exception to the warrant requirement, as did the parties. " '[E]xigent circumstances are present when law enforcement officers do not have sufficient time to obtain any form of warrant' " because of the immediate and urgent circumstances confronting them. *Pena–Flores, supra,* 198 *N.J.* at 30, 965 *A.*2d 114 (quoting *State v. Johnson,* 193 *N.J.* 528, 556 n. 7, 940 *A.*2d 1185 (2008)).

Before this Court, the State has refined its argument, claiming that the emergency-aid doctrine provides a fitting constitutional template for addressing the facts of this case. We agree. The

emergency-aid doctrine is a "species of exigent circumstances," *United States v. Martins*, 413 *F*.3d 139, 147 (1st Cir.2005), and, in our view, the lens through which we should judge the conduct of the police in this case.[4]

"The emergency aid doctrine is derived from the commonsense understanding that *exigent circumstances* may require public safety officials, such as the police, firefighters, or paramedics, to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." *Frankel, supra,* 179 *N.J.* at 598, 847 *A*.2d 561 (emphasis added). The primary rationale for the doctrine is that neither the Fourth Amendment nor Article I, Paragraph 7 of our State Constitution requires "that public safety officials stand by in the face of an imminent danger and delay potential lifesaving measures while critical and precious time is expended obtaining a warrant." *Id.* at 599, 847 *A*.2d 561. For that reason, " '[a] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person.' " *Id.* at 600, 847 *A*.2d 561 (quoting *Wayne v. United States,* 318 *F*.2d 205, 212 (D.C.Cir.), *cert. denied,* 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.*2d 86 (1963)).

When viewing the circumstances of each case, a court must avoid "the distorted prism of hindsight" and recognize "that those who must act in the heat of the moment do so without the luxury of time for calm reflection or sustained deliberation." *Id.* at 599, 847 *A*.2d 561. A court must "examine the conduct of those officials in light of what was reasonable under the fast-breaking and potentially life-threatening circumstances that were faced at the time." *Ibid.*

---

[4] It is well-recognized that the emergency-aid doctrine is a subset of exigent circumstances. *United States v. Holloway,* 290 *F*.3d 1331, 1337 (11th Cir.2002), *cert. denied,* 537 *U.S.* 1161, 123 *S.Ct.* 966, 154 *L.Ed.*2d 897 (2003); *United States v. Richardson,* 208 *F*.3d 626, 630 (7th Cir.), *cert. denied,* 531 *U.S.* 910, 121 *S.Ct.* 259, 148 *L.Ed.*2d 188 (2000). Accordingly, there should be no surprise about our more focused analysis.

■■■■■ To justify a warrantless search under the emergency-aid doctrine, the State must satisfy a two-prong test. *State v. Edmonds*, 211 *N.J.* 117, 132, 47 *A.*3d 737 (2012). The State has the burden to show that "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched." *Ibid.* (internal quotation marks omitted). "The emergency aid doctrine only requires that public safety officials possess an objectively reasonable basis to believe—not certitude—that there is a danger and need for prompt action." *Frankel, supra*, 179 *N.J.* at 599, 847 *A.*2d 561. The reasonableness of a decision to act in response to a perceived danger in real time does not depend on whether it is later determined that the danger actually existed. *Ibid.*

■■■■■ "The scope of the search under the emergency aid exception is limited to the reasons and objectives that prompted the search in the first place." *Ibid.* Therefore, police officers looking for an injured person may not extend their search to small compartments such as "drawers, cupboards, or wastepaper baskets." *Ibid.* If, however, contraband is "observed in plain view by a public safety official who is lawfully on the premises and is not exceeding the scope of the search," that evidence will be admissible. *Id.* at 599–600, 847 *A.*2d 561.

## C.

The applicability of the emergency-aid doctrine in this case in large part depends on whether Officer Armstrong had a reasonable basis to credit a Taj Mahal patron's report of an armed robbery made to a casino security official, even though the patron was no longer present when Armstrong arrived on the scene.

■■■ Police officers oftentimes must rely on information provided by others in assessing whether there is probable cause to

believe a crime has been committed or whether there is an objectively reasonable basis to believe an ongoing emergency threatens public safety. *See, e.g., State v. Brown,* 170 *N.J.* 138, 157, 784 *A.*2d 1244 (2001) (noting that "an informant's hearsay statements can be used to determine whether probable cause exists in the Fourth Amendment context"). Crimes are reported by citizens unafraid to identify themselves, confidential informants, and citizens who do not give their names. In all three of those scenarios, the information related to the police, when offered in court, is hearsay, although the quality of the information may depend on the source. When the source of the information is not inherently trustworthy, then some degree of corroboration will be required to justify a police action. *State v. Rodriguez,* 172 *N.J.* 117, 127–28, 796 *A.*2d 857 (2002). Thus, typically, "the reliability of anonymous informers ... must be established." *State v. Davis,* 104 *N.J.* 490, 506, 517 *A.*2d 859 (1986). On the other hand, the police may assume that an "ordinary citizen" reporting a crime does not have suspect motives. *Ibid.* An ordinary citizen "may be regarded as trustworthy and information imparted by him to a policeman concerning a criminal event would not especially entail further exploration or verification of his personal credibility or reliability before appropriate police action is taken." *Ibid.* (internal quotation marks omitted).

"Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information." *State v. Basil,* 202 *N.J.* 570, 586, 998 *A.*2d 472 (2010); *see also State v. Stovall,* 170 *N.J.* 346, 362, 788 *A.*2d 746 (2002) (noting that when citizen is informant "veracity is assumed"). One reason a face-to-face encounter with a citizen is considered more reliable than a purely anonymous tipster is that "an in-person informant risks losing anonymity and being held accountable for a false tip." *Ibid.* (internal quotation marks omitted).

Private-citizen information does not lose its reliability merely because it is passed from one law enforcement officer to

another for police action. *United States v. De Cesaro*, 502 *F*.2d 604, 607 n. 6 (7th Cir.1974) (noting that "policemen are presumed to be reliable, and that an affiant policeman need not give additional reasons for believing the report of another policeman"). Another factor to be considered is that the greater the threat to public safety, the greater the need may be for prompt action, and thus allowances must be made for the fact that perfect knowledge is often not attainable at the moment the police must act. *See State v. Golotta*, 178 *N.J.* 205, 221–22, 837 *A.*2d 359 (2003); *see also Florida v. J.L.*, 529 *U.S.* 266, 273, 120 *S.Ct.* 1375, 1380, 146 *L.Ed.*2d 254, 262 (2000) (suggesting that "the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability"). The ultimate test is whether, under the totality of circumstances, the officer's actions were objectively reasonable given the nature of information at hand. Several examples will illustrate this point.

In *Edmonds, supra,* a person dialing from a pay telephone called the Roselle Park Police Department 9–1–1 line, identified himself as "John Smith," and stated that he believed that his sister's boyfriend was beating her and was armed with a gun. 211 *N.J.* at 137, 47 *A.*3d 737. The caller gave a Carteret address where the purported domestic violence was occurring and the name of his sister, but he left no contact information and his identity was unverifiable. *Id.* at 123, 137, 47 *A.*3d 737. The Carteret police met the alleged victim outside her apartment. *Id.* at 138, 47 *A.*3d 737. She showed no sign of injuries, denied the domestic violence allegation, and refused to permit the officers entry to her home, even though her young son was inside. *Id.* at 138, 47 *A.*3d 737. Nevertheless, pursuant to the emergency-aid doctrine, we held that the police had a right to enter the apartment to ensure that the son was not in jeopardy.[5] *Id.* at 140, 47 *A.*3d 737.

---

[5] We ultimately held that the police unconstitutionally exceeded the permissible scope of the emergency-aid doctrine by searching a room after entry revealed no signs of domestic violence. *Edmonds, supra,* 211 *N.J.* at 138–40, 47 *A.*3d 737.

In *Golotta, supra,* a police officer received a dispatch that a 9–1–1 call described a car on a public roadway as " 'weaving back and forth,' " and " 'out of control.' " 178 *N.J.* at 209, 837 *A.*2d 359. The 9–1–1 caller only wanted to report the erratic driving and " 'did not want to file a charge' " or become further involved. *Id.* at 209–10, 837 *A.*2d 359. The police officer stopped a vehicle fitting the 9–1–1 caller's description without waiting to make observations of the operator's driving pattern because doing so might have endangered other motorists or the driver himself. *Id.* at 226, 837 *A.*2d 359. We found that the police officer had an objectively reasonable basis to make the stop "to protect [the driver] and the public from a threat of death or serious injury occasioned by defendant's suspected condition." *Id.* at 228, 837 *A.*2d 359.

In *Basil, supra,* an eyewitness told police that a man pointed a shotgun at her and then hid the weapon under a nearby vehicle. 202 *N.J.* at 587, 998 *A.*2d 472. The witness refused to identify herself to police "out of an expressed fear for her safety" and left the scene. *Ibid.* The Court explained that the woman's report "was a face-to-face encounter that allowed the officer to make an on-the-spot credibility assessment of the citizen informant." *Ibid.* The Court noted that at the time the witness gave the information to police, she could not have known that she would not be taken into custody as a witness or later sought out to become involved in the case. *Ibid.* The Court held that the woman's failure to identify herself did "little to diminish the reliability of the information when it was given." *Ibid.; see also Golotta, supra,* 178 *N.J.* at 219, 837 *A.*2d 359 (concluding that 9–1–1 callers who fail to identify themselves "are not truly anonymous" and "that a 9–1–1 call carries a fair degree of reliability inasmuch as it is hard to conceive that a person would place himself or herself at risk of a criminal charge by making such a call" (internal quotation marks omitted)).

Therefore, the discovery of a gun under a pillow was suppressed. *Id.* at 139–41, 47 *A.*3d 737.

■ Thus, our jurisprudence makes clear that police officers may rely on reliable information—even when classified as hearsay in court—in determining whether exigent circumstances dictate that time does not allow for securing a warrant when prompt action is required.

## IV.

We now turn to whether, in light of the totality of the circumstances, Officer Armstrong and his fellow officers had a right to enter Room 7023 under the emergency-aid exception to the warrant requirement. We begin with a discussion of the nature and quality of the information provided to Officer Armstrong before he conducted the warrantless search of the hotel room.

### A.

■ Here, a patron reported to security personnel at the Taj Mahal that he was a victim of an armed robbery on the 70th floor of the hotel. The patron did not attempt to hide his identity, which was recorded on the hotel and casino's surveillance monitors. He did not identify the specific room where the robbery occurred or give a singularly precise description of the suspect, lessening the possibility that the patron was a malicious prankster intent on falsely incriminating a particular person. *See United States v. Wheat*, 278 *F*.3d 722, 735 (8th Cir.2001) (noting that "risk of false tips is slight compared to the risk of not allowing the police immediately to conduct an investigatory stop" of person reported to be carrying concealed weapons), *cert. denied*, 537 *U.S.* 850, 123 *S.Ct.* 194, 154 *L.Ed.*2d 81 (2002). Although he eventually walked away after giving his armed-robbery report, the hotel patron in this case—as was true of the witness in *Basil*—could not have known that he would not be required to give his name or held as a material witness.

Officer Armstrong undoubtedly had frequent contact with Taj Mahal security personnel as part of his special employment detail at the casino and had a firsthand basis to gauge their reliability in

conveying information. *See State v. K.V.*, 821 *So.*2d 1127, 1128 (Fla.Dist.Ct.App.2002) (considering "the security guard tipster as a highly reliable citizen informant" (internal quotation marks omitted)); *State v. Luke*, 995 *S.W.*2d 630, 637 (Tenn.Crim.App. 1998) (noting that security guard's tip is "presumed reliable"). Specialized training, moreover, is not necessarily required to repeat what another person has said. In *Davis, supra,* we recognized the high degree of reliability that is afforded to information conveyed by a first-aid-squad member. 104 *N.J.* at 506–07, 517 *A.*2d 859. The Court explained that "the informer is more than the ordinary citizen—he is a member of the Springfield First Aid Squad, an individual who, while not part of the government, is more involved and presumably more public spirited than the average citizen." *Id.* at 506, 517 *A.*2d 859. As sources of reliable information, we see no meaningful distinction between first-aid-squad members and casino-security personnel who are acting in a quasi-law enforcement capacity.

We conclude that the hotel patron in this case is more akin to an eyewitness citizen informant than an anonymous tipster. The patron reported an armed robbery in a face-to-face conversation with casino personnel under the watchful eye of surveillance cameras, a point probably not lost on the patron. The patron's facial and other physical characteristics were known to the casino's security personnel, providing the possibility of his later identification. Further, the patron's account of the armed robbery did not give security personnel any reason to suspect he falsely reported the crime with the intent to embarrass or harass some innocent person. *Cf. J.L., supra,* 529 *U.S.* at 272, 120 *S.Ct.* at 1379–80, 146 *L.Ed.*2d at 261 (recognizing that anonymous tips may enable tipster to "harass another" through "intrusive [and] embarrassing police search of the targeted person").

Security personnel told Officer Armstrong that based on their experiences dealing with robbery victims, the patron appeared credible. Moreover, the patron's report was not taken at face value. Officer Armstrong directed security personnel to call the

surveillance department to corroborate the patron's report. Within the five or less minutes that the surveillance department had to review reams of video footage, casino security advised Officer Armstrong that the patron was observed with four other individuals on an elevator that went to the 70th floor and later was observed leaving Room 7023 alone, in a hurry and a seemingly panicked state.

Given the information available, and within the time constraints pressed on him by the report of a gunman on the loose in the Taj Mahal, Officer Armstrong had no objectively reasonable basis to doubt the patron's veracity or the report of an armed robbery.

### B.

We next apply the two-prong test of the emergency-aid exception to the warrant requirement.

Under our emergency-aid jurisprudence, the first inquiry is whether Officer Armstrong "had an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury." *See Edmonds, supra,* 211 *N.J.* at 132, 47 *A.*3d 737 (internal quotation marks omitted). The events in this case must be viewed as they were unfolding—in real time—and as the dangers appeared to a reasonable police officer. "The touchstone of the Fourth Amendment and Article I, [P]aragraph 7 of the New Jersey Constitution is reasonableness." *State v. Judge,* 275 *N.J.Super.* 194, 200, 645 *A.*2d 1224 (App.Div.1994); *see also United States v. Knights,* 534 *U.S.* 112, 118, 122 *S.Ct.* 587, 591, 151 *L.Ed.*2d 497, 505 (2001).

Officer Armstrong was called to the security podium of the Taj Mahal casino around 4:00 a.m. based on a patron's report of an armed robbery. The trial court—as a matter of law—erred in dismissing as unreliable the patron's report merely because the patron did not wait for the police to arrive. *See Basil, supra,* 202

*N.J.* at 587–89, 998 *A.*2d 472. Nothing in the record supports the trial court's finding that the patron refused to give his name.

Officer Armstrong could not just ignore the report of an armed robbery because the patron was not available for questioning. Police officers in the field must act on dispatches based on 9-1-1 calls without access to the informants. Officer Armstrong was facing a high-risk, public-safety danger: the prospect of a gunman on the premises. He could not possibly know at that moment whether there were other victims or whether patrons and staff were in peril.

The trial court erred by viewing the events through "the distorted prism of hindsight" rather than through the eyes of a reasonable police officer facing "fast-breaking and potentially life-threatening circumstances." *See Frankel, supra,* 179 *N.J.* at 599, 847 *A.*2d 561. Officer Armstrong made the decision that exigent circumstances did not permit him to spend ten to fifteen minutes walking to the surveillance department to review reams of video footage while a gunman might be holed up in Room 7023 or loose on the premises. He remained at his post, arranging for the SWAT team's assistance and for casino security to have the surveillance department corroborate, if it could, the patron's account. Critical events—the arrival of the SWAT team and the video-footage review—occurred within a five-minute period. The surveillance department had but minutes to run through scores of individual clips and relay essential information corroborating the patron's account to Officer Armstrong. Armstrong was told that the patron took an elevator to the 70th floor with two males and two females and later abruptly left Room 7023.

The trial court had the luxury of reviewing more than an hour's worth of video footage. No doubt, the trial court had more information from the video footage at the hearing than Officer Armstrong had around 4:00 a.m., in an emergent situation, in the casino's lobby. An extended time to review the footage may support the trial court's view, as one reasonable interpretation, that the patron did not look panicked when he departed from

Room 7023. But the question is whether, in the heat of the moment, based on seemingly reliable information, not certitude, Officer Armstrong acted in an objectively reasonable manner while facing a grave danger to public safety. Viewed from that perspective, and given the totality of the circumstances at the time based on the evidence before us, the answer is yes.

The second question posed by the emergency-aid doctrine is whether "there was a reasonable nexus between the emergency" and the search of Room 7023. Officer Armstrong and the SWAT team proceeded to the room where the patron claimed he had been robbed. Although the patron did not identify the room number, the surveillance cameras tracked him leaving Room 7023. The police officers took measured steps before entering the room. They placed telephone calls to the room and verbally called inside—all without a response. The trial court found that one could reasonably conclude from the unlocked room door that a hotel guest would be returning shortly, perhaps after filling an ice bucket. But that was not the only reasonable inference to be drawn, and no one was seen in the hallway returning from a trip to the vending machines. Given the totality of the circumstances, another reasonable inference was that a victim might have been incapacitated or a gunman might have been hiding in the room.

A warrant is not required to rescue a victim who may be injured or whose life may be in jeopardy. *Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561. The trial court found, on one hand, that the police should have applied for a telephonic warrant and, on the other hand, that the police did not have probable cause to secure one. The emergency confronting the officers relieved them of the need to obtain a warrant for the purpose of entering the room for the limited mission of assuring that neither a victim nor a gunman was there.

Indeed, the scope of the search of the room was confined to looking for possible victims and the gunman. The police discovered the handgun in plain view, in a wide-open duffel bag sitting on a counter by the bed. *See State v. Bruzzese,* 94 *N.J.* 210, 236, 463

A.2d 320 (1983) (holding that plain view warrant exception requires officer to "be lawfully in the viewing area," and that items be discovered "inadvertently" and "immediately apparent" as evidence of crime). Accordingly, the seizure of the weapon was lawful.

The trial court's misapplication of the law governing exigent circumstances led to a number of clearly mistaken factual findings. Therefore, the Appellate Division's affirmance of the trial court's suppression of the handgun must be reversed.

## V.

In summary, we reverse the judgment of the Appellate Division and remand to the trial court for a new suppression hearing. We note that the trial court judge who presided at the suppression hearing has since retired. At the suppression hearing, the trial court made its decision to suppress the handgun based on the State's presentation alone, relieving the defense of the need to call any of its subpoenaed witnesses.

Defendant has a right to call witnesses to show that the State did not meet its burden of proving the emergency-aid exception to the warrant requirement. For instance, the defense could present witnesses who might possibly undermine the testimony of Officer Armstrong. Our judgment is limited to the record before us. At a new hearing, the trial court must make factual findings based on all the credible evidence. Nothing stated in this opinion restricts the trial court in performing that task.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ–VINA, SOLOMON and Judge CUFF(temporarily assigned)—7.

*Opposed*—None.