**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3338-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JARLY CASTANEDA,

    Defendant-Appellant.

_____

Submitted June 4, 2025 – Decided June 23, 2025

Before Judges Rose and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 23-01-0118.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Michael Denny, Assistant Deputy Public Defender, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Thomas R. Clark, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Jarly Castaneda appeals from the August 29, 2023 Law Division order denying his motion to suppress evidence obtained during a pedestrian investigatory stop and the sentence he received after pleading guilty to two charges arising from a residential burglary. We affirm.

I.

In 2023, a grand jury charged defendant with: (1) second-degree burglary, N.J.S.A. 2C:18-2(a)(1); (2) fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4); (3) second-degree unlawful possession of a weapon, N.J.S.A. 2:39-5(b); (4) second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and (5) fourth-degree possession of a large-capacity magazine, N.J.S.A. 2C:39-3(j).

Defendant moved to suppress evidence obtained when he was stopped by police officers responding to a 9-1-1 call. He argued the officers lacked the reasonable suspicion of criminal activity required by Terry v. Ohio, 392 U.S. 1 (1968), rendering the stop unconstitutional.

The motion court held an evidentiary hearing at which the State called two New Brunswick police officers. Officer Noe Vazquez testified as follows. On October 8, 2022, he was on patrol with his partner at 2:36 a.m. when he received a transmission from the dispatcher that a 9-1-1 caller reported shots fired

through a window at her residence on Comstock Street. Vazquez and his partner were three or four blocks from the residence. They responded to the scene, arriving in about three minutes. While the officers were en route, the dispatcher stated the suspect was a white male wearing a red shirt and black pants.[1]

At the scene, Vazquez and his partner spoke with the victim, who reported she heard a knock on the rear door of her residence which leads to her kitchen. Several people were in the kitchen and the lights were on, illuminating the rear door. When the victim opened the door, a man was standing outside pointing a handgun at her. He demanded to see "Cheppe." The victim was familiar with Cheppe, but he was not present at her home. After he was told Cheppe was not there, the suspect, still brandishing his gun, entered the residence to look for him. Apparently satisfied that Cheppe was not there, the suspect left the home.

The victim stated that as the suspect was leaving the premises, she heard a loud noise she thought was a shot and saw her kitchen window was destroyed. She later determined the suspect punched out her kitchen window, either with the gun or his fist. The officers found no evidence a shot had been fired at the scene.

---

[1] The dispatcher and officers referred to the suspect in their radio transmissions as a "number one male," which is a New Brunswick Police Department radio designation for a white male, either Hispanic or non-Hispanic.

While speaking with the victim, Vazquez heard a radio transmission indicating two other officers had detained two suspects on Delavan Street, a few blocks from the scene. One of the detained suspects was wearing a red shirt and black pants. Over the radio, Vazquez stated the suspect in the red shirt and black pants might be armed. The arresting officer then made a radio transmission stating a firearm had been found on the suspect.

Officer Christopher Mohr testified as follows. On October 8, 2022, he was on patrol with his partner when he heard the dispatcher send other officers to a report of shots fired on Comstock Street. The dispatcher transmitted the description of the suspect as a white male in a red shirt and black pants. Mohr and his partner, who were nearby, headed toward Comstock Street, but did not activate the patrol vehicle's lights and sirens. Their intention was to look for the suspect and they did not want to alert him to their presence in the area.

About five minutes after the dispatch, at Delavan Street and Livingston Avenue, a block and a half from the victim's residence, Mohr saw two men walking on the sidewalk on Delavan Street. One was wearing a red shirt and black pants. As the officers approached in their vehicle, Mohr saw the man in the red shirt and black pants was white. He activated the vehicle's emergency lights and drove in the direction of the two men. Mohr's partner made a radio

transmission they were stopping two men, one of whom was wearing a red shirt and black pants.

The two officers exited the vehicle and Mohr told the men to stop and show their hands. The man in the red shirt and black pants, later identified as defendant, complied. The other man fled. When defendant raised his hands, Mohr noticed blood running down defendant's right arm.

Mohr ordered defendant to put his hands on a nearby fence. Defendant complied. Mohr patted down defendant. The officer asked defendant if he had a "pistola," which means handgun in Spanish, and why he was bleeding. Defendant did not respond.

During the pat down, Mohr noticed defendant moving the lower part of his body toward the fence and keeping his upper body away from the fence. The officer thought defendant's movements indicated he was trying to hide something on his person. Mohr patted down defendant's lower body and felt the handle of a gun in the waistband of his pants. The officer removed a loaded handgun and magazine from defendant's pants. Mohr arrested defendant. The recordings from the body worn cameras of the officers who testified were played for the court.

A-3338-23

On August 29, 2023, the court issued an oral decision denying the motion. The court found when Mohr observed defendant on Delavan Street and confirmed he matched the description given by the dispatcher, the officer had reasonable suspicion based on specific articulable facts that defendant recently engaged in criminal activity and was armed. Defendant was in close physical proximity to the scene of an armed residential burglary that took place approximately five minutes earlier. He matched the racial, gender, and clothing descriptions given by the caller. That reasonable suspicion, the court concluded, permitted Mohr to conduct an investigatory stop and pat down of defendant. An August 29, 2023 order memorialized the motion court's decision.

On April 1, 2024, defendant pled guilty to second-degree burglary and second-degree unlawful possession of a weapon. In exchange, the State agreed to have the court consider defendant's second-degree burglary as a third-degree conviction for purposes of sentencing and to recommend for that conviction a five-year sentence subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The State also agreed to recommend a seven-year period of imprisonment with a forty-two-month period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), for the unlawful possession of a weapon conviction and that the two sentences run concurrently. The State agreed to recommend

A-3338-23

dismissal of the remaining counts of the indictment. Defendant preserved his right to appeal the denial of his motion to suppress.

At sentencing, the court found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) ("The risk that the defendant will commit another offense . . . ."), and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) ("The need for deterring the defendant and others from violating the law . . . ."). The court also found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7) ("The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense . . . ."). The court also gave moderate weight to a non-statutory mitigating factor: defendant's history of substance abuse, recognizing defendant's claim he was under the influence of narcotics when he committed the burglary. The court found the aggravating factors outweighed the mitigating factors.

The court concluded a sentence at the top of the range for a third-degree offense was appropriate for defendant's conviction for second-degree burglary. The court sentenced defendant pursuant to the terms of the negotiated agreement. A June 4, 2024 judgment of conviction memorialized defendant's convictions and sentence.

This appeal followed. Defendant raises the following arguments:

A-3338-23

POINT I

THE TRIAL COURT SHOULD HAVE GRANTED THE MOTION TO SUPPRESS PHYSICAL EVIDENCE BECAUSE THE POLICE DID NOT HAVE A REASONABLE BELIEF THAT [DEFENDANT] WAS ARMED AND DANGEROUS.

POINT II

THE SENTENCING COURT FAILED TO APPROPRIATELY FIND AND WEIGH THE APPLICABLE AGGRAVATING AND MITIGATING FACTORS.

II.

A.    Motion to Suppress.

Our scope of review of the motion court's suppression order is well established. Our review of the court's factual findings after a hearing is "exceedingly narrow." State v. Locurto, 157 N.J. 463, 470 (1999) (citing State v. Johnson, 42 N.J. 146, 161-62 (1964)). Our deference includes the motion court's findings based on video recording or documentary evidence. See State v. S.S., 229 N.J. 360, 374-81 (2017) (clarifying the deferential and limited scope of appellate review of factual findings based on video evidence); see also State v. McNeil-Thomas, 238 N.J. 256, 271-72 (2019). Deference is afforded because the court's findings "are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are

A-3338-23

not transmitted by the record." Locurto, 157 N.J. at 474.  We must defer to those findings so long as they are supported by sufficient credible evidence in the record.  State v. Nelson, 237 N.J. 540, 551 (2019) (quoting In Interest of J.A., 233 N.J. 432, 445 (2018)).  By contrast, the court's interpretation of the law and the legal "consequences that flow from established facts" are reviewed de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

Both the United States and New Jersey Constitutions protect citizens against unreasonable searches and seizures.  See U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  The parties agree Mohr's encounter with defendant was an investigatory stop, which constitutes a seizure under both the federal and State constitutions.  An investigatory stop or detention, sometimes referred to as a Terry stop, involves a temporary seizure that restricts a person's movement.  A Terry stop implicates a constitutional requirement there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity."  State v. Elders, 192 N.J. 224, 247 (2007) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)).

The State has the burden to establish that a stop was valid.  State v. Mann, 203 N.J. 328, 337-38 (2010); State v. Pineiro, 181 N.J. 13, 19-20 (2004).  If there was no reasonable suspicion of criminal activity to justify the stop,

evidence discovered as a result of the stop is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

To determine whether reasonable suspicion existed, a judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. Nelson, 237 N.J. at 554 (quoting State v. Stovall, 170 N.J. 346, 361 (2002)). Investigatory stops are justified "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." State v. Davis, 104 N.J. 490, 505 (1986).

> A court must first consider the officer's objective observations. The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." "[A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." Second, a court must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing."
>
> [Id. at 501 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)) (alterations in original).]

Mohr conducted a Terry stop and pat down of defendant based on a report of criminal activity and a description of the suspect obtained from a 9-1-1 caller.

"Generally speaking, information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster." State v. Basil, 202 N.J. 570, 586 (2010). "Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information." Ibid. This is so because "we assume that an ordinary citizen 'is motivated by factors that are consistent with law enforcement goals,'" ibid. (quoting Davis, 104 N.J. at 506), and thus may be regarded as trustworthy. State v. Hathaway, 222 N.J. 453, 471 (2015). Information received from a citizen "concerning a criminal event would not especially entail further exploration or verification of his personal credibility or reliability before appropriate police action is taken." Ibid. (quoting Davis, 104 N.J. at 506).

In each of these precedents, our Supreme Court found the report of criminal activity by an ordinary citizen, when considered in context with other facts, was sufficient to give law enforcement personnel authority to enter a home under the emergency aid exception to the warrant requirement, see State v. Frankel, 179 N.J. 586, 598 (2004), effectuate an arrest based on probable cause, or conduct a Terry stop. A critical element of the Court's analysis in each case was the citizen reported criminal acts based on personal knowledge.

A-3338-23

For example, in Basil, the victim of a crime, who refused to identify herself because she feared for her safety, approached an officer when he arrived at the scene and said that Basil pointed a shotgun at her before tossing the weapon under a nearby car. 202 N.J. at 587. Her statement was based on "information from her personal knowledge regarding events that occurred minutes earlier." Ibid. "Importantly, the young woman's reliability was immediately corroborated by the discovery of the shotgun in the precise location where she said it was discarded." Ibid. The Court found the citizen's corroborated report gave the officer probable cause to arrest Basil. Ibid.

Similarly, in Hathaway, at approximately 4:00 a.m., the "animated" and "upset" victim of an armed robbery approached casino security personnel and reported he had been robbed at gunpoint and forced to disrobe in his hotel room. 222 N.J. at 461. A few minutes later, the victim left the casino without revealing his identity. Ibid. The security official viewed a surveillance video that confirmed the victim arrived at a specific hotel room with two men and two women, and left alone in what appeared to be a panic shortly before giving his report of having been robbed. Id. at 462. The security official relayed this information, and his observation that the gunmen and two women may still be in the room, to a law enforcement officer. Ibid. The Court found the officer

had no objectively reasonable basis to doubt the victim's report, id. at 476, and an objectively reasonable basis to believe that an emergency required him to enter the hotel room without a warrant. Id. at 476-79.

In Davis, a member of the local first aid squad called 9-1-1 to report he observed two men on bicycles "hanging around" a closed gas station just before midnight. 104 N.J. at 494. Based on that information, an officer, who found no one at the gas station, searched for the suspects in his patrol car. Id. at 495. About three blocks from the station, the officer encountered two men on bicycles riding against traffic, whom he stopped pursuant to Terry. Ibid. Ultimately, the two men admitted they had stolen the bicycles. Id. at 496. The Court found a member of a first aid squad "while not part of the government, is more involved and presumably more public spirited than the average citizen." Id. at 506. Thus, the Court found, "[t]he police could . . . rely on him as a credible source of information." Ibid. The Court concluded the report "furnished [a] sufficient basis for the police to investigate whether criminal activity had occurred or was about to occur," justifying a Terry stop. Ibid.

In addition, a 9-1-1 call "carries enhanced reliability not found in other contexts" because the 9-1-1 system records information identifying the phone number and location from which the call is made. State v. Golotta, 178 N.J.

205, 218 (2003). "Our statutes also criminalize the false reporting of emergencies and explicitly include within their ambit calls placed to 9-1-1." Id. at 219. "In view of those provisions, . . . a 9-1-1 call carries a fair degree of reliability inasmuch as 'it is hard to conceive that a person would place himself or herself at risk of a criminal charge by making'" a false report of criminal activity through 9-1-1. Ibid.

Here, the 9-1-1 caller reported a white man in a red shirt and black pants shot through her kitchen window. That information was transmitted to Mohr immediately by the dispatcher. Approximately five minutes later, about a block and a half from the scene of the shooting and at about 2:45 a.m. when pedestrian traffic in the residential neighborhood was likely low, he observed a man who matched the caller's description walking on the sidewalk. Importantly, although at the time that Mohr stopped defendant the officers interviewing the victim at the scene had determined no shot had been fired, they also confirmed the suspect had pointed a handgun at the victim. That information – that the suspect in the red shirt and black pants was likely armed – was transmitted to Mohr as he was initiating the Terry stop. Thus, as the stop was taking place, Mohr received confirmation from another officer that the victim was reporting the suspect had, a few minutes earlier, threatened her with a handgun. These facts amply support

the motion court's finding Mohr had reasonable suspicion based on articulable specific facts defendant recently engaged in criminal activity and was armed.[2]

B.    Defendant's Sentence.

We review defendant's sentence for abuse of discretion. State v. Pierce, 188 N.J. 155, 166 (2006). We must affirm a sentence

> unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

The sentencing court must examine the aggravating and mitigating factors enumerated in N.J.S.A. 2C:44-1(a) and (b). Id. at 72. Each factor found by the court must be relevant and supported by "competent, reasonably credible evidence." Ibid. (quoting Roth, 95 N.J. at 363). The court then must conduct a qualitative balancing of the factors to determine the appropriate sentence. Id. at

---

[2] Given our affirmance of the court's denial of defendant's motion to suppress based on the validity of the Terry stop, we need not address the State's argument that prior to the Terry stop, Mohr had probable cause to arrest defendant and search him incident to arrest.

A-3338-23

72-73. One "reasonable" approach is for the court to begin its analysis in the middle range for the offense at issue and determine whether the factors justify departure above or below the middle range. Id. at 73 (quoting State v. Natale, 184 N.J. 458, 488 (2005)).

Defendant argues the court failed to properly weigh the aggravating and mitigating factors at sentencing. He argues the court's finding of aggravating factor three was erroneous because his criminal history consisted only of a conditional discharge of a municipal court conviction for possession of marijuana, which had been decriminalized as of the time of the present offenses. In addition, he argues the court's finding of aggravating factor nine was erroneous because the court stated its intention to "send a message" that armed residential burglary will result in a significant sentence.

We are unpersuaded by these arguments. The court sentenced defendant in accordance with the negotiated plea agreement. He received a sentence on the high end of the range for a third-degree conviction, even though he pleaded guilty to second-degree burglary. As the court found, defendant's armed intrusion into the victim's home in the wee hours of the morning after pointing a gun at her warranted a significant period of incarceration both as a sanction

16

for his criminal behavior and a deterrent to others who might contemplate terrorizing a victim in their home through an armed burglary.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3338-23