**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2840-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SHANE A. WHIPPLE,

     Defendant-Appellant.

_____

Submitted September 19, 2022 – Decided September 30, 2022

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 18-03-0692.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Rachel M. Lamb, Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

A jury convicted defendant Shane Whipple of the first-degree murder of his aunt, Jennifer Whipple, with a hatchet. On this appeal, he challenges an order denying his motion to suppress the warrantless entry into Jennifer's[1] apartment, raises various claims of trial errors, and challenges his sentence. We affirm.

On Thursday, January 25, 2018, Officer James Bendig of the Winslow Township Police Department responded to a domestic incident at Jennifer's apartment. Defendant also lived in the apartment. Jennifer called the police because defendant had been throwing things in his bedroom. In addition, Jennifer told police that earlier in the week, defendant told her "to go put a knife in her throat." Jennifer told police she was scared and wanted defendant removed from the apartment. Officer Bendig confiscated two key fobs from defendant, escorted him to gather some belongings from his room, and advised him he needed a police escort if he wanted to return to the apartment.

Two days later police were contacted by Jennifer's father, David, requesting a well-being check on her. Officer Nicholas Cobian arrived and knocked on Jennifer's apartment door but did not receive a response. He noted

---

[1] Because multiple people in this matter share the Whipple surname, this opinion will refer to them by first name. We intend no disrespect.

A-2840-19

her car was still in the parking lot and the hood was cold, indicating the car had not been operated recently. He then contacted David and learned of the previous incident and looked up the police report. Patrolman Kurt Gunson arrived at the scene, then both officers returned to Jennifer's apartment and knocked, but did not receive an answer. Officer Cobian noticed the apartment door was unlocked. The officers entered and discovered Jennifer's body on her bedroom floor.

A Camden County Grand Jury returned an indictment charging defendant with: First-degree murder, N.J.S.A. 2C:11-3(a)(1) (count one); unlawful possession of certain weapons (a hatchet), N.J.S.A. 2C:39-5(d) (count two); and possession of a weapon for unlawful purposes, N.J.S.A. 2C:39-4(d) (count three).

Defendant filed a motion to suppress the warrantless entry into Jennifer's apartment. Officer Cobian testified on behalf of the State, recounting the facts of his January 27 visit to Jennifer's apartment. After receiving no answer to his knocks on Jennifer's door and the observations he made about her car, Officer Cobian testified he called David, who relayed "that two nights prior there was a disturbance at the residence between Jennifer and [defendant]" and defendant "was escorted off the property and . . . forfeited his key." David explained he spoke to his daughter daily but had no contact from her in one or two days.

3

Officer Cobian then looked up the prior domestic incident report, which recounted defendant's removal from Jennifer's apartment. In pertinent part, the report stated an officer

> spoke to [defendant] and advised him . . . Jennifer wanted him to leave the residence for good. [Defendant] stated that[] all he wants to do is leave. He handed over the keys to the entry gate and doorway for the complex. [The officer] stood by as [defendant] removed his belongings from the residence and into his vehicle. Jennifer was given the signed copy of the Victim Notification Form stating she did not want to apply for a [temporary restraining order] at this time. [Defendant] advised he was going to stay in a shelter for the evening.

After Officer Cobian read the report, he called Officer Gunson for backup, and the two proceeded upstairs.

The officers attempted to contact building management to obtain entry into Jennifer's apartment but were unable to reach anyone. They knocked on Jennifer's door "for several minutes" but did not receive an answer. When Officer Cobian discovered the door unlocked he radioed dispatch and stated he was going to enter the apartment and discovered Jennifer. The officers recorded their entry into the apartment on their body worn cameras and the footage from Officer Gunson's camera was played at the suppression hearing.

A-2840-19

The State also called Sergeant Victoria Patti, the lead crime scene unit detective from the Camden County Prosecutor's Office in charge of the investigation. She stated she and the other law enforcement officers left the apartment complex once Jennifer's body was removed because they were awaiting a search warrant, which was issued a few hours later.

Defendant argued he had standing to contest the warrantless entry to the apartment because he lived in the apartment for two years prior. He pointed to the domestic incident report, which stated defendant "advised he was going to stay in a shelter for the evening." (emphasis added). He claimed he did not remove all his belongings from the home, which showed an intent to return, and Jennifer did not seek a restraining order, which belied an intent to permanently remove him.

The defense also argued the emergency aid warrant exception did not apply because "there was no objectively reasonable belief that immediate action was necessary to protect or to save a life." David had lost contact with Jennifer for a brief time and police did not hear or observe anything requiring them to enter without a warrant. Further, "police didn't act as if it was an emergency" because officers spent approximately half-an-hour on the premises before

opening the unlocked door. The unlocked door did not prove an emergency because Jennifer could have forgotten to lock it.

The trial judge found Officer Cobian's testimony "extremely credible" and corroborated by the domestic incident report, the dispatch call Jennifer made, and the body-worn camera footage. The judge concluded defendant lacked standing to object to the warrantless entry because he "was a trespasser. It's clear that he was told he had to leave terminally. He turned in his keys. He knew that he was not to return to the residence, and he did." Defendant "no longer lived at the address in question. Neither of them, . . . defendant or [Jennifer], were under the impression that he lived there. Because he is not an owner or a resident, he has no reasonable expectation of privacy."

Even if defendant had a reasonable expectation of privacy, the judge found the emergency aid warrant exception applied because "when [police] went to enter, they had an objectively reasonable basis to believe that an emergency required . . . they check to make sure . . . [Jennifer] was okay, to protect or preserve life or serious injury." The judge cited the information police had at the time, namely, the domestic incident report and David's request for a well-being check. The "motivation for entering into the home was certainly not to find or seize any evidence. It was to render assistance." The discovery of

6

Jennifer's body on the floor of her bedroom proved "a reasonable nexus between the emergency and the area or the place to be searched." The judge denied the motion.

David testified for the State at trial. He said he was concerned for Jennifer's safety "[b]ecause she had some incidents with problems with [defendant and] arguments" during the two years defendant lived with her.

The State called Officer Bendig, who testified about his response to the domestic incident. When the officer arrived, he "found [defendant] in the parking lot in his vehicle." The officer's conversation with defendant was recorded on his body-worn camera, which the State played for the jury. On the recording, defendant claimed he was "just going through a lot in [his] head" and that he "wasn't fighting with [Jennifer] at all." He stated he "was throwing stuff in [his] room and then [Jennifer] yelled." When the officer told defendant he was responding to a domestic incident, defendant admitted he "got mad" and "flipped [his] bed over." He stated: "We just had a fucking beef . . . . I threw my shit out. . . . [S]he tried to come talk to me. I locked my door. She went back to her room and then I just came out here to fucking try to calm down."

Officer Bendig urged defendant to "go inside and figure out what's going on" but defendant responded: "I don't want to go inside. I don't want to talk to

A-2840-19

her. . . . I didn't touch her. I didn't say anything. We weren't even arguing. I yelled at her one time."

Officer Cobian testified for the State about the discovery of Jennifer's body and the murder scene. He stated Jennifer's bedroom door was "cracked open with the light on inside" and when he entered the bedroom, he "observed Jennifer deceased on the floor. . . . There was a large amount of blood on her and throughout the bedroom and it appeared that she suffered from trauma to the head and face." While clearing the apartment, he observed "[s]everal blood spatters on the floor" and "[a] button on the floor."

Sergeant Patti also testified and described the scene in a similar fashion. She "observed . . . what appeared to be teeth and also some suspected bone fragment on the floor as well as several clumps of hair." She found a suspected blood stain on the front door of the apartment, two blood stains on the kitchen floor, and four suspected blood stains in the kitchen sink.

The State called Gary Luh, the owner and manager of Asian Pavilion, a martial arts and gifts store. He testified his store sells axes and hatchets and that his store packages items in a white box with a red sticker. He recalled selling "one or two" hatchets on January 26. Luh provided police a receipt dated January 26 at approximately 3:58 p.m. for $28.80, including tax, bearing the

same last four digits as defendant's credit card and defendant's signature. He confirmed the item sold corresponded with the price of an axe.

The State called Jennifer's neighbor who testified he arrived home on January 26 around 4:52 p.m.[2] As he made his way to his apartment, he observed a Caucasian male wearing dark clothing at the top of the stairwell. As the neighbor passed the man, he was able to get a "[p]retty good look" at his face, and he heard "like a little snicker." The neighbor later picked defendant out of a photo array and identified him as the individual he saw on January 26.

The State called Camden County Prosecutor's Office Detective Matthew Barber. He retrieved the surveillance video of vehicles entering through the main gate of the apartment complex and the common entryway used by persons entering the building. The footage showed defendant's vehicle entering the apartment complex gate at 4:11 p.m. on January 26. Detective Barber testified the video showed a male wearing a black hat, black jacket, and camouflage pants enter the building around 4:38 p.m. "carrying a flat white box in a bag." The box "had a[n] orange sticker on the end of it." He testified the individual's description matched the description of defendant from the domestic incident.

---

[2] The State played surveillance footage from the apartment complex depicting the neighbor arriving at 4:57 p.m.

Approximately one minute later, the individual exited the building carrying the same white box. The individual entered the building again carrying the white box at 4:50 p.m. and exited at 5:01 p.m., and his vehicle exited the gate at 5:02 p.m. The State played the surveillance footage for the jury.

Detective Barber corroborated the testimony regarding Jennifer's wounds and testified regarding the evidence retrieved from her cell phone. On January 26, at 4:35 p.m. defendant texted Jennifer: "I need to come get some of my stuff out of the apartment." Defendant subsequently called Jennifer, but his call went unanswered. Then, the following text message exchange occurred between 4:45 p.m. and 4:47 p.m.:

> [Jennifer:] Did you call officers to have them come? I can take it to you. I have been washing clothes and packing when I can while working.
>
> . . . .
>
> [Defendant:] I'm here now. I just need some stuff from the closet.
>
> . . . .
>
> [Jennifer:] I'm almost done packing but working right now. In a meeting, M-T-G. When do you need?
>
> . . . .
>
> [Jennifer:] Clothes?

10 <span>A-2840-19</span>

. . . .

[Defendant:]  Now.

. . . .

[Jennifer:]  Do you have room for food?

. . . .

[Defendant:]  Paperwork and socks.

. . . .

[Jennifer:]  Are you outside?

. . . .

[Defendant:]  Yep.

After the last message, Jennifer called officer Bendig at 4:48 p.m. Defendant then sent Jennifer another message at 4:51 p.m., stating:  "I'm coming up now."  Jennifer responded:  "You are supposed to have officers."  Defendant replied:  "I don't need to bother the cops with socks."  At 4:55 p.m., Jennifer responded:  "I will bring it out.  You're coming in."  At 5:10 p.m. defendant sent an additional text stating:  "[Never mind].  I'll just get it later."  This last message was sent approximately nine minutes after the surveillance footage captured defendant leaving the building.

11

Lieutenant Barber testified he also spoke to the manager of the Berlin Mart, which houses the Asian Pavilion, and retrieved surveillance footage from the premises. He reviewed footage near the time noted on the credit card receipt and discovered footage showing a white vehicle the same color as defendant's pull into the parking lot and the driver enter the Asian Pavilion. The driver "dressed and looked similar to the individual" at Jennifer's apartment complex and wore a black hat, black jacket, and camouflage pants. The individual exited the store at approximately 3:59 p.m. carrying a flat white box in a plastic bag. The surveillance was also jury also shown to the jury.

Sergeant William Rumell, Jr. from the Camden County Prosecutor's Office's Crime Scene Investigations Unit also testified on behalf of the State regarding the evidence collected from defendant's person and his vehicle. He testified defendant's personal items included a dark knit hat and a black jacket. While photographing defendant, the sergeant observed and "photographed a small cut on one finger of each hand." Police also recovered an "olive green knit hat, two green washcloths, one of which appeared to have suspected blood stains, and one red washcloth." The washcloth stains subsequently tested positive for blood.

A-2840-19

Sergeant Rumell retrieved "a pair of camouflage cargo style pants with suspected blood stains on the legs, two black Puma sneakers, high top sneakers, with suspected bloodstains, [and] a black hooded sweatshirt with what [police] thought were suspected blood stains . . . ." He testified the pants were missing the top button, and noted "[a] button similar to the remaining buttons on the pants was collected at the crime scene." The stains on the pants and sneakers were positive for blood. Blood stains were also found on the vehicle's emergency brake and gear shifter.

The State called a forensic scientist from the New Jersey State Police Laboratory's serology unit who was admitted as an expert in biological stain analysis and forensic serology. He confirmed a swab taken from Jennifer's kitchen sink, defendant's camouflage pants, and a swab from the gear shift from defendant's vehicle all tested positive for blood.

The State called a forensic scientist from the New Jersey State Laboratory's DNA unit who was admitted as an expert in forensic DNA analysis. She testified the stain on defendant's pants contained DNA from two people, one of which was Jennifer's. She was unable to identify the other person.

The State called the medical examiner who performed Jennifer's autopsy and was admitted as an expert in anatomic and forensic pathology. He testified

13

Jennifer had "multiple complex injuries to her face, meaning, . . . they overlapped each other and created multiple areas of injuries." He noted "large gaping injuries to the eyes, as well as . . . around the mouth area." Jennifer's left eye was ruptured and her right eye had abrasions and scrapings. In addition she had "fracturing to the facial structures[,]" including a crushed jaw, missing teeth, and a fractured cheek bone.

On the left side of Jennifer's head there was "a three[-]centimeter defect" in her scalp and two additional defects approximately seven or eight inches behind her left ear. Jennifer had suffered crushing bone injuries which fractured the base of her skull and damaged her brain. The examiner observed "a large area of sharp force injury" on the back of Jennifer's wrist. She also had injuries on her right upper arm and forearm. Siebert testified these were defensive type injuries. He observed a large injury on her left arm that appeared to be created on a tangent, causing a flap in the skin, among other various injuries.

The medical examiner concluded Jennifer died due to "[m]ultiple sharp and blunt force injuries" and the manner of her death was homicide. Further, "these wounds were not caused, simply, by a typical knife that you would expect, that it would be something larger and heavier like a hatchet, an axe or, maybe even a small machete."

14

During a break on the second day of trial, defense counsel informed the judge that the previous day she "was walking out of the back hallway, and Juror Number 1 was walking — was waiting, and she walked in. And [defense counsel] stopped her and . . . said, 'Oh no, you can't — you can't go in.'" Counsel stated she informed the prosecutor of the interaction but "didn't think anything of it." She was informing the court because when the judge advised the jury not to interact with the parties or attorneys, the juror "looked over" at her. After conferring with counsel, the judge told the jury:

> I do understand yesterday in the back hallway there was a brief interaction between one of the jurors and one of the attorneys. The attorney explained to me what happened, and that interaction was perfectly fine. So after the cautionary instruction, I just wanted to make sure that attorney did explain to me the brief interaction, and it, again, was perfectly okay, perfectly fine.

At the charge conference, the trial judge asked the attorneys whether they sought to charge the jury on lesser included offenses, and both declined. The judge agreed and made the following findings: "And there [i]s no rational basis that I saw for either aggravated manslaughter or any lesser included in the murder charges based on the evidence that was presented in court . . . ." After delivering the charges, the judge asked the parties if they had objections and neither objected. Later that day, the jury convicted defendant on all three counts.

A-2840-19

At sentencing, the trial judge found aggravating factor N.J.S.A. 2C:44-1(a)(1), "[t]he nature and circumstances of the offense . . . including whether or not it was committed in an especially heinous, cruel, or depraved manner" and N.J.S.A. 2C:44-1(a)(3), "[t]he risk that the defendant will commit another offense," and gave them great weight. The judge gave moderate weight to aggravating factor N.J.S.A. 2C:44-1(a)(6), "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted." He found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the defendant and others from violating the law" and assigned it great weight. The judge found no mitigating factors, concluding he was "clearly convinced that the aggravating factors outweigh the mitigating factors."

The judge sentenced defendant to seventy-five years' imprisonment with eighty-five percent parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge merged counts two and three into count one and imposed the corresponding fines and fees.

On appeal, defendant raises the following points:

POINT I

THE CONVICTIONS SHOULD BE REVERSED BECAUSE UNLAWFULLY OBTAINED EVIDENCE

16

WAS INTRODUCED AT TRIAL — EVIDENCE THAT WAS DISCOVERED DURING, OR AS A DIRECT RESULT OF, A WARRANTLESS ENTRY INTO THE HOME NOT JUSTIFIED BY THE EMERGENCY AID EXCEPTION TO THE WARRANT REQUIREMENT. U.S. Const. amends. IV and XIV; N.J. Const. art. I, ¶ 7.

POINT II

THE [SEVENTY-FIVE]-YEAR NERA SENTENCE WAS UNDULY PUNITIVE, MANIFESTLY EXCESSIVE, AND SHOULD BE REDUCED.

Defendant's pro se brief raises the following points:

POINT I:

THE DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE COURT'S FAILURE TO CHARGE THE JURY ON LESSER INCLUDED OFFENSES.

POINT II:

THE VERDICT MUST BE SET ASIDE AND DEFENDANT GIVEN A NEW TRIAL DUE TO THE FACT ONE OF THE JURORS WAS COMPROMISED AND SHOULD HAVE BEEN RELEASED, AND THE ENTIRE JURY PANEL SHOULD HAVE BEEN QUERIED.

POINT III:

THE EXTENT TO WHICH THE STATE HAS BLATANTLY LIED AND MISCONSTRUED FACTS IN THIS CASE CONSTITUTES A CERTAIN LEVEL OF PERJURY AND/OR ENTRAPMENT. AS SUCH,

17

THE STATE MUST BE DENIED THE ABILITY TO
FURTHER LITIGATE THIS CASE.

I.

Defendant challenges the denial of the suppression motion on standing grounds and argues the emergency aid exception to the warrant requirement did not apply. We are unconvinced the trial judge erred.

"In reviewing a motion to suppress, an appellate court 'must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record.'" State v. Handy, 206 N.J. 39, 44 (2011) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). Fact-finding based on video-recorded evidence is subject to the same standard of review. State v. Hagans, 233 N.J. 30, 38 (2018). A trial court's factual findings are afforded deference because they are "substantially influenced by [a trial judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Legal conclusions drawn from those facts are reviewed de novo. State v. Smith, 212 N.J. 365, 387 (2012).

The United States and New Jersey Constitution guarantee an individual's right to be free from unreasonable searches and seizures by government officials. U.S. Const. amend IV; N.J. Const. art I, ¶ 7. The Supreme Court has

emphasized "[t]he sanctity of one's home is among our most cherished rights" which is "entitled to the highest degree of respect and protection within our constitutional framework." State v. Frankel, 179 N.J. 586, 611-12 (2004). A warrantless search is therefore presumptively unreasonable unless the State can demonstrate, by a preponderance of the evidence, there was probable cause and the search "f[ell] within one of the few well-delineated exceptions to the warrant requirement." Hagans, 233 N.J. at 38-39 (alteration in original) (quoting State v. Bryant, 227 N.J. 60, 69-70 (2016)).

Our law confers automatic standing upon a defendant to challenge a search or seizure "where they have either 'a proprietary, possessory or participatory interest in either the place searched or the property seized. . . .'" State v. Lamb, 218 N.J. 300, 313 (2014) (quoting State v. Alston, 88 N.J. 211, 228 (1981)). In State v. Randolph, the Court recognized exceptions to the automatic standing rule holding that in cases concerning real property, a defendant does not have automatic standing to contest a search if the defendant was trespassing or lawfully evicted from the premises. 228 N.J. 566, 585 (2017). The Court reasoned "[a] trespasser does not have standing to challenge a search because 'a trespasser, by definition, does not have a possessory or proprietary interest in

property where he does not belong—where he does not have permission or consent to be.'" Id. at 586 (quoting State v. Brown, 216 N.J. 508, 535 (2014)).

We are convinced the trial judge properly found defendant was a trespasser. The evidence shows defendant was asked to leave the premises for good. When police advised defendant of Jennifer's wishes, he relinquished his keys and was advised not to return to the apartment without calling police.

Notwithstanding the trespasser issue, the warrantless entry was valid under the emergency-aid exception. State v. Fede, 237 N.J. 138, 146 (2019). This exception furthers a police officer's "vital community-caretaking role." Id. at 145. An officer may conduct a warrantless entry "for the purpose of protecting or preserving life, or preventing serious injury." Id. at 146 (quoting State v. Edmonds, 211 N.J. 117, 130 (2012)). The State must demonstrate "(1) the officer had 'an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or to prevent serious injury' and (2) there was a 'reasonable nexus between the emergency and the area or places to be searched.'" Edmonds, 211 N.J. at 132 (quoting Frankel, 179 N.J. at 600); see also State v. Hathaway, 222 N.J. 453, 468-70 (2015).

The plain-view doctrine is another recognized exception to the warrant requirement. State v. Gonzales, 227 N.J. 77, 90 (2016). The doctrine's "constitutional limiting principle is that the officer must lawfully be in the area where he observed and seized the incriminating item or contraband, and it must be immediately apparent that the seized item is evidence of a crime." Id. at 101. If an officer enters a home pursuant to the emergency-aid exception looking for an injured person, they may seize evidence observed in plain view so long as the scope of the search is not extended beyond the circumstances which prompted the entry. Hathaway, 222 N.J. at 470.

The trial judge's finding that officers were permitted to enter Jennifer's apartment without a warrant under the emergency-aid exception is supported by the record. As the judge noted, officers "had an objectively reasonable basis to believe that an emergency required . . . they check to make sure . . . [Jennifer] was okay, to protect or preserve life or serious injury." The officer's understanding was based on David's concern and inability to contact Jennifer, her failure to answer the door despite her car being parked in front of the building, and the officers' review of the domestic incident report.

There was also a reasonable nexus between the emergency and the place to be searched, considering it was Jennifer's home; her car was parked outside,

indicating she may be present; and it was the scene of the prior domestic incident. Also, Jennifer's body was found in plain view through her open bedroom door.

## II.

We reject defendant's argument the trial judge erred by not sua sponte charging the jury with lesser included offenses. Defendant's assertion there was reversible error in how the judge handled the juror interaction with defense counsel is also unpersuasive.

## A.

It is well established that "'[a]ppropriate and proper charges to a jury are essential for a fair trial.'" State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). The trial court has a duty "'to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" State v. Canfield, 470 N.J. Super. 234, 269 (App. Div. 2022) (quoting State v. Baum, 224 N.J. 147, 159 (2016)); see also State v. Funderburg, 225 N.J. 66, 80 (2016) ("A trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it.").

"[N]o defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense . . . ." State v. Muhammad, 182 N.J. 551, 577 (2005) (quoting State v. Garron, 177 N.J. 147, 180 (2003)). A court may instruct the jury on a lesser-included offense so long as it is supported by the rational basis in the record. Canfield, 470 N.J. Super. at 272. However, "[i]f parties do not request a lesser-included-offense charge, reviewing courts 'apply a higher standard, requiring the unrequested charge to be "clearly indicated" from the record.'" Id. at 272-73 (quoting State v. Fowler, 239 N.J. 171, 188 (2019)).

A defendant may be charged with aggravated manslaughter if he "recklessly causes death under circumstances manifesting extreme indifference to human life[.]" N.J.S.A. 2C:11-4(a)(1). Manslaughter may be charged if a defendant recklessly committed a homicide or the homicide was "committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b). An individual behaves recklessly when they "'consciously disregard[] a substantial and unjustifiable risk' that death will occur from the defendant's conduct, and disregarding the risk 'involves a gross deviation from the standard of conduct that a reasonable person would observe' in the same situation." Fowler, 239 N.J. 171 at 188-89 (quoting N.J.S.A. 2C:2-2(b)(3)).

As we noted, neither party requested a lesser-included offense instruction and expressly declined such a charge. Moreover, as the trial judge correctly found, there is nothing in the record supporting a manslaughter or aggravated manslaughter charge and the recklessness attendant to the elements of either statute. The evidence only supports the State's theory of the case; that defendant acted purposely and with premeditation in purchasing the hatchet, traveling to Jennifer's apartment, and murdering her. The domestic incident with Jennifer would not lead a jury to conclude defendant acted recklessly or was provoked to do so because the dispute occurred two days prior to the murder. Additionally, no evidence was adduced of a provocation occurring on the day of the murder.

B.

Defendants have a constitutional right to an impartial jury. State v. Little, 246 N.J. 402, 414 (2021). "That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." State v. R.D., 169 N.J. 551, 557 (2001) (citing State v. Bey, 112 N.J. 45, 75 (1988)). "[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any

potential bias and to expose factors impinging on the juror's impartiality." Id. at 557-58. If the circumstances suggest a juror was tainted, the trial court "is obliged to interrogate the juror in the presence of counsel to determine if there is a taint. If so, the court is then obliged to interview the other jurors to determine if they or any of them have been infected by the taint." Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 1:16-1 (2022). Once the trial court has ascertained the extent of the taint, it should determine whether any jurors should be dismissed or whether a mistrial should be declared. Ibid.; see also State v. Brown, 442 N.J. Super. 154, 180-82 (App. Div. 2015).

The brief interaction between defense counsel and the juror does not convince us the juror was tainted thereby requiring a further investigation by the judge. No trial related information was exchanged between counsel and the juror. Defense counsel merely informed the juror she was not allowed into the courtroom. Regardless, defense counsel requested the judge address the jury to prevent the juror from thinking she did something wrong and we are satisfied the curative instruction given by the judge after consulting with the parties resolved the issue.

III.

Defendant alleges the trial court improperly weighed the aggravating and mitigating factors. He argues he should have received a thirty-year sentence.

Defendant challenges the trial court's finding of aggravating factor N.J.S.A. 2C:44-1(a)(1), arguing the court double counted Jennifer's death, an element of the offense. He contends "Jennifer had expired from her injuries within seconds of the attack — there was no indication that she was subjected to additional suffering or torture." He claims the only harm Jennifer suffered was death, which occurs in all murders.

Defendant also challenges the court's finding of aggravating factor N.J.S.A. 2C:44-1(a)(3). He asserts the judge observed a "scowl" on defendant's face when Jennifer's family members were speaking at sentencing and impermissibly deduced his emotional state and propensity for future criminality based on a facial expression. Defendant argues the finding of aggravating factors N.J.S.A. 2C:44-1(a)(6) and (9) was erroneous, because these factors are routinely found together and "should be given little weight, particularly when found in conjunction with each other."

Defendant argues the court erred in failing to find mitigating factor N.J.S.A. 2C:44-1(b)(8) ("The defendant's conduct was the result of

circumstances unlikely to recur."). He argues the trial court misinterpreted the holding in State v. Jarbath, 114 N.J. 394, 414-15 (1989), stating mitigating factor eight only applies when the defendant has no prior record, and the death was accidental. Regardless, he maintains he did not have a history of violence and there was no indication a "unique domestic circumstance[] between an aunt and her nephew" would recur because "there is no reason to believe . . . this was not an aberrational, one-time event."

Our review of a sentencing court's decision is limited and subject to an abuse of discretion standard. State v. Jones, 232 N.J. 308, 318 (2018). A reviewing court should defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014). The deferential standard of review applies "only if the trial judge follows the [Criminal] Code and the basic precepts that channel sentencing discretion.'" State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting Case, 220 N.J. at 65). Therefore, we "must affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95

27

N.J. 334, 364-65 (1984)).

Under aggravating factor N.J.S.A. 2C:44-1(a)(1), the court "reviews the severity of the defendant's crime, 'the single most important factor in the sentencing process,' assessing the degree to which defendant's conduct has threatened the safety of its direct victims and the public." State v. Fuentes, 217 N.J. 57, 74 (2014) (quoting State v. Lawless, 214 N.J. 594, 609 (2013)). This analysis "must be premised upon factors independent of the elements of the crime and firmly grounded in the record." Id. at 63. Where appropriate, the court may "reference . . . the extraordinary brutality involved in an offense." Id. at 75. A court may consider whether "the defendant intended 'to inflict pain, harm, and suffering — in addition to intending death.'" Ibid. (quoting State v. O'Donnell, 117 N.J. 210, 217-18 (1989)).

We discern no error in the trial judge's analysis. Defendant was convicted of first-degree murder. The judge relied on Fuentes, and its finding that a court may reference the "extraordinary brutality" used to commit an offense to justify finding aggravating factor N.J.S.A. 2C:44-1(a)(1). The judge found "[t]here are several facts present in this case which illuminate the heinous nature of this crime which far exceed that which is required to prove . . . [defendant] caused the victim's death and he did so purposely and knowingly." The judge noted the

following: Jennifer was defendant's close relative; she "was found with deep defens[ive] wounds on both of her arms" and head; was missing seven teeth; and had crushed facial bones, resulting in a "mutilated" face. The judge correctly concluded "this crime was excessive and it was gory" and did not impermissibly double-count by considering the manner of killing.

The trial judge's reference to defendant's scowl was relevant to the court's analysis of defendant's lack of remorse. More importantly, the judge noted defendant "was arrested on ten separate occasions in five different states from 2009 through 2016." Defendant was on probation for an offense committed in Kansas in 2015 when he murdered Jennifer. Based on this, the court concluded "[c]learly, when he was under . . . supervision, he is not capable of abiding by the law" and posed a risk of re-offending. Therefore, the judge's findings under aggravating factors N.J.S.A. 2C:44-1(a)(3) and (6), and the weight accorded them, were supported by the record.

Pursuant to aggravating factor N.J.S.A. 2C:44-1(a)(9), the judge concluded "punishing [defendant] harshly for this crime, would also . . . greatly ensure that he would be less likely to commit another crime, as well as deter him if he is released." The judge also found a general need for deterring society from committing violent crimes such as the murder of a family member.

A-2840-19

Our Supreme Court has stated: "In the absence of a finding of a need for specific deterrence, general deterrence 'has relatively insignificant penal value.'" Fuentes, 217 N.J. at 79 (quoting Jarbath, 114 N.J. at 405). Here, the evidence supports the judge's finding of a need for specific deterrence, and we discern no error in finding aggravating factor N.J.S.A. 2C:44-1(a)(9).

Likewise, the judge did not err in declining to find mitigating factor N.J.S.A. 2C:44-1(b)(8). Mitigating factor eight may be declined if a court concludes defendant "might act similarly" if "he found himself in a situation like the one underlying the present case[.]" State v. Jabbour, 118 N.J. 1, 9 (1990).

The judge correctly declined to find this factor because Jennifer's murder was premeditated and purposeful. He noted defendant is "somebody who cannot control his emotions. So I do find this is a circumstance[] that is likely to reoccur." Based on the evidence, we are unconvinced this was an erroneous conclusion.

Finally, to the extent we have not addressed an argument raised on the appeal, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2840-19