# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1628-21
A-1629-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

D.B. and D.H.,

      Defendants-Appellants.

_____

IN THE MATTER OF S.B.,
a Minor.

_____

Argued September 18, 2023 – Decided November 30, 2023

Before Judges Gooden Brown and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FN-16-0160-20.

Ted G. Mitchell, Deputy Public Defender, argued the cause for appellant D.B. (Joseph E. Krakora, Public

Defender, attorney; Ted G. Mitchell, of counsel and on the briefs).

Beth Anne Hahn, Designated Counsel, argued the cause for appellant D.H. (Joseph E. Krakora, Public Defender, attorney; Beth Anne Hahn, on the briefs).

Michelle J. McBrian, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; John Joseph Lafferty, IV, Deputy Attorney General, on the brief).

Cory Hadley Cassar, Designated Counsel, argued the cause for minor S.B. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory Hadley Cassar, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants D.B.[1] (mother) and D.H. (father) appeal from the August 31, 2021, Family Part order finding they abused or neglected their then four-year-old daughter, S.B., within the meaning of N.J.S.A. 9:6-8.21(c), by using narcotics while caring for S.B. and allowing S.B. to have access to drug paraphernalia, including empty glassine packets of suspected heroin and capped and uncapped syringes. The August 31 order was

---

[1] We use initials to protect the privacy of the family. R. 1:38-3(d)(12).

perfected for appeal by a December 21, 2021, order terminating the litigation. We affirm.

I.

On June 28, 2020, the Division of Child Protection and Permanency (Division) executed an emergency removal of S.B., pursuant to N.J.S.A. 9:6-8.29 and -8.30, following a police referral prompted by defendants' arrests. A fact-finding hearing was conducted over three days in June and August 2021, during which several witnesses testified for the Division and documentary exhibits were admitted into evidence. Defendants also testified on their own behalf.

At the hearing, Paterson Police Officer Randy Nouh, a seven-and-one-half year veteran, testified that before 7:30 a.m. on June 28, 2020, he and two other officers responded to D.B.'s apartment based on a 911 call reporting a "[d]omestic assault." As Nouh approached the front door, he heard "[s]creaming, yelling, a lot of noise in the background, [and] a little girl's voice." After Nouh "knocked on the door" to announce the officers' presence, a child, later identified as S.B., "opened the door." Through the open door, Nouh observed an individual, later identified as D.H., "[standing] in the

3

background . . . staring into thin air." Nouh and the other officers "entered the apartment" to investigate the reported domestic dispute.

Once inside, Nouh observed that the apartment "was in disarray." He recounted that "empty heroin glassin[e] packets" were "everywhere" and within S.B.'s reach. Nouh also observed that D.H.'s "eyes were bloodshot red," "his clothing was disheveled," and "he did[ not] appear to be in his right state of mind." While speaking to D.H., D.H. told Nouh that "he needed help" and volunteered that he "was under the influence" of "heroin and . . . crack" and that he had been "up all night" using the illicit substances. Next, Nouh spoke to D.B., who had initially locked herself inside the bathroom. After exiting the bathroom, D.B. "admitted to using heroin" "earlier in the morning" and admitted to taking unprescribed "Xanax." In addition, both defendants presented needle exchange program cards to Nouh, demonstrating their ability to obtain sterile syringes "[f]or their heroin addiction," and Nouh observed "capped and uncapped" "syringes throughout the home."

During cross-examination, Nouh admitted that he did not "collect th[e] heroin packages" to preserve as evidence, "test the packages for residue of heroin or other drugs," or "take picture[s] of [the glassines and syringes]." Nouh also acknowledged that he did not have a warrant to enter and search D.B.'s

4

apartment, that he "[was] not given . . . consent by an adult to enter," and that

he did not "provide [D.B. or D.H.] with a <u>Miranda</u>[2] warning" before speaking

with them.  However, Nouh maintained that "[he] did not interrogate [D.B. or

D.H.]" and that defendants voluntarily "made admissions" about their drug use.

After obtaining supervisory approval, both defendants were arrested for

child endangerment and a referral was made to the Division.  According to

Nouh, D.H. was transported to St. Joseph's University Medical Center (St.

Joseph's) after he requested "medical attention."  Although D.B. initially refused

medical treatment, she was also transported to St. Joseph's "for a pre[-]existing

injury on her right wrist which appeared . . . infected."

According to D.B.'s certified medical records from St. Joseph's, which

were admitted into evidence without objection, D.B. "report[ed] shooting [four]

bags of heroin around 7:30 [a.m.] to 8[:00 a.m.]" the day of her arrest and

"not[ed] that it[ was] . . . normal to her."  D.H.'s certified medical records were

also admitted into evidence, "[s]ubject to the [c]ourt excluding any embedded

hearsay."[3]  According to his medical records, D.H. "admit[ted] to using cocaine

---

2  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

3  Although the judge sustained D.H.'s objection to the admission of any embedded hearsay contained in the medical records, D.B. did not join D.H.'s objection.

[the night before], [two] bags of IV heroin a few hours ago, and drinking [alcohol] overnight."

After receiving the police referral, Zulay Beltran, a Division supervisor, responded to the Paterson police station and interviewed D.B. Beltran testified that D.B. made several admissions to her regarding illicit drug use. Beltran also testified that D.B. "appeared . . . very drowsy" and "under the influence," and recalled that D.B. "would lose her balance" when she was standing.

Jenny Sierra, a Division caseworker, accompanied Beltran to the police station and interviewed S.B.[4] S.B. told Sierra that she lived with both parents and police had come to her house earlier that day because "her mother had a temper tantrum . . . [after] her father accused her mother of taking his stuff." When Sierra asked "what [S.B.] meant by stuff," S.B. "indicated that it was mom['s] and dad's medicine," which they took to "ma[k]e them feel better." S.B. described the medicine as "white stuff" that her parents put "in a needle" which they "would then put . . . in their arm[s]." S.B. stated that she "would observe both [parents] taking the medicine together," and that the "medicine" would make them "very tired and sleepy." S.B. also stated that her father "would get

---

[4] Although Nouh had indicated that S.B. "appeared to be fine," Sierra testified that S.B. "looked dirty" and "[h]er body odor had a foul smell to it."

6

mad . . . when he didn't take his medicine" and that he would "throw [D.B.] around the house" and "push [D.B.]," and that D.B. would then "hide in the bathroom."

Both defendants testified, refuting the Division's proofs. D.H. denied that "there were syringes, capped and uncapped, and glassine baggies in plain sight" in the apartment. D.H. also claimed that "[Nouh] was lying" when he testified that he (D.H.) had made admissions about drug use. D.H. denied "ever us[ing] drugs in front of [S.B.]" and accused the Division of "concoct[ing]" the entire case.

According to D.H.'s version of events, he went to D.B.'s apartment around 6:30 a.m. on the morning in question to see his daughter before work. During the visit, he got into a heated verbal argument with D.B., as a result of which D.B. retreated into the bathroom and a neighbor complained about the noise. When the police arrived, D.H. claimed they handcuffed him and questioned him without advising him of his Miranda rights. D.H. stated he was asked whether he lived in the apartment, what he was doing in the apartment, and what his relationship was to D.B. D.H. testified that after he was questioned, the officers "pulled [D.B.] out of the bathroom," "put her in handcuffs," and "proceeded" to search her "drawers" and "closet" inside her bedroom. Although D.H. admitted

requesting medical attention, he denied telling anyone at the hospital about drug use. He explained that he wanted medical attention because he thought he "was going to pass out" from the police encounter. D.B.'s testimony mirrored D.H.'s.

After the hearing, in an August 31, 2021, oral opinion, the judge found that the Division met its burden of showing that D.B. and D.H. "abused or neglected [S.B.]" within the meaning of N.J.S.A. 9:6-8.21(c)(4). After recounting the testimony of the witnesses and the documentary exhibits, the judge posited he was "faced with competing testimony" and "exact opposite stories," with D.B. and D.H. "basically den[ying] everything." To resolve the "[c]ompletely divergent positions" taken by the parties, the judge found the "hospital records" particularly persuasive, explaining:

> When someone goes to the hospital[,] in order to treat someone they have to take a detailed history from that patient. Because in order to be able to treat them they have to know what their symptoms are and what their recent history is. And I note hospital workers are not law enforcement officers. They have no ax[e] to grind in this case.

The judge summarized the evidence contained in the hospital records as follows:

> [D.B.] tells the person that took the history, "Patient reports shooting four bags of heroin around 7:30 a.m. to 8[:00] a.m. noting that it's normal to her." Now this

8

is something that's asked of her while the hospital has to determine her treatment and what's wrong with her.

I also note [D.H.] when asked by the hospital staff, he stated[,] "He admits to using cocaine last night. Two bags of I.V. heroin a few hours ago and drinking alcohol overnight. Patient states that he did not use these substances in an attempt to harm or kill himself."

Then, in specifically assessing the credibility of the witnesses, the judge found Nouh's testimony to be "credible," "reasonable," and "inherently believable." The judge noted that Nouh was "an experienced police officer," "provided forthright answers," had a "good demeanor," and had "no special interest in th[e] case." The judge also found that Nouh's "testimony was . . . supported by the hospital records as to the statements made by both defendants in terms of using . . . illicit substances." The judge also credited Sierra's testimony about S.B.'s statements. However, the judge noted that the information S.B. provided to Sierra during the interview about defendants' drug use was "not the basis for [his] decision."

In contrast, the judge "[did] not find either [D.H.] or [D.B.] . . . to be credible [witnesses]." The judge explained that during D.H.'s testimony, he "came across . . . as being angry" and "his testimony [was] largely contradicted by . . . [the] credible testimony of . . . the hospital records . . . and . . . Nouh." As to D.B., the judge acknowledged that D.B. "gave straight answers and . . .

9

did not really avoid questions," but concluded that her testimony was also "largely contradicted by other credible testimony, mainly the hospital record, and . . . the credible testimony of . . . Nouh."

Next, to determine the admissibility of Nouh's testimony regarding the drug paraphernalia he observed while inside the apartment, the judge addressed whether Nouh lawfully entered D.B.'s apartment. The judge concluded that "the police . . . had the right to enter [D.B.'s] apartment to investigate the emergency that they were responding to under the [c]ommunity [c]are [t]aking [d]octrine." Because the officers were responding to a domestic dispute, the judge found that the "officer[s] had a duty, not just to stand and speak with the two parents" but to "investigate" if there was "anyone . . . causing danger to the child or the parties in that home." Critically, the judge pointed out that the drug paraphernalia "[was] found in plain view."

Turning to the Miranda issue defendants raised to challenge the admissibility of their unwarned admissions of illicit drug use, the judge noted that the officers were "responding to an emergency," "there were no accusatory questions asked," and the questioning occurred "when the police first came in the apartment." The judge concluded that "Miranda warnings were not necessary" for defendants' admissions to Nouh at the apartment. However, the

10

judge determined he would not consider D.B.'s admissions to Beltran during her interview at the police station.

Following the evidentiary rulings, the judge applied the pertinent provisions of N.J.S.A. 9:6-8.21(c)(4)(b) to the credible evidence presented at the hearing and concluded that the Division met its burden "by a preponderance of the evidence." The judge determined that defendants "failed to exercise a minimum degree of care in protecting their child by using strong narcotics . . . while their four-year-old child was in their care and by allowing the child to have access to various items of narcotics paraphernalia, including empty glassines and capped and uncapped syringes." The judge found that these circumstances were "sufficient proofs of [imminent] danger and substantial risk of harm" and "enter[ed] a finding of abuse and neglect" against defendants.

In these ensuing appeals, in A-1628-21, D.B. raises the followings points for our consideration:

> [POINT I]
>
> UNLAWFUL ENTRY INTO A HOME, CUSTODIAL QUESTIONING AND INVESTIGATIVE FAILURES TO GATHER SUPPOSEDLY AMPLE EVIDENCE OF DRUG USE SHOULD HAVE BARRED USE OF A POLICE OFFICER'S CLAIMS ABOUT WHAT HE OBSERVED OR STATEMENTS HE ATTRIBUTED TO A MOTHER TO SUSTAIN A JUDGMENT WITH

11 <span>A-1628-21</span>

INDELIBLE, LIFE-LONG CONSEQUENCES UNDER N.J.S.A. [9:6-8.21(C)(4)].

A. A Police Officer's Entry Into [a] Home [t]o Investigate [a] Neighbor's Noise Complaint After [a] Child Opened [t]he Door Was Not Justified [b]y [t]he Community Caretaking Doctrine, Barring Use of [t]he Officer's Alleged Observations.

B. The Trial Court's Use [o]f Statements Attributed [t]o [a] Mother By [a] Police Officer Who Questioned Her While [i]n Custody and [i]n [t]he Presence of Her Child Violated Her Right [t]o Notice [o]f [a] Right [t]o Remain Silent, [t]o Counsel and [t]o Due Process.

[POINT II]

A STATEMENT ATTRIBUTED TO A MOTHER AFTER BEING ARRESTED, CONTAINED IN A HOSPITAL RECORD BUT LEFT UNEXPLAINED BY ANY [DIVISION] WITNESS AND OBTAINED WHILE IN POLICE CUSTODY, WAS NOT ADMISSIBLE AS A STATEMENT MADE FOR PURPOSES OF DIAGNOSIS OR TREATMENT AND ITS USE WAS PLAIN ERROR[.] (NOT RAISED BELOW).

[POINT III]

EVEN ASSUMING DRUG USE BY D.B. WHILE CARING FOR HER CHILD, EVIDENCE DID NOT SHOW SHE PROVIDED LESS THAN THE MINIMUM DEGREE OF CARE, CREATED

12

IMMINENT DANGER OR A SUBSTANTIAL RISK TO VIOLATE N.J.S.A. [9:6-8.21(C)(4)(B)].

In A-1629-21, D.H. raises the following points for our consideration:

POINT I

THE PATERSON POLICE DEPARTMENT'S WARRANTLESS, NON-CONSEN[S]UAL SEARCH OF [D.B.]'S APARTMENT AND QUESTIONING OF [D.H.] WERE ILLEGAL; THEREFORE, THE STATE'S SUBSEQUENT PROSECUTION IN THIS QUASI-CRIMINAL MATTER LACKED THE COMPETENT EVIDENCE NECESSARY TO SUSTAIN A TITLE 9 JUDGMENT.

    A.    The Officers' Non-Consensual Entry and Warrantless Search of [D.B]'s Apartment Were Not Authorized by the Community Caretaking Doctrine; Therefore, Any Evidence or Testimony Generated as a Result of the Search Are Inadmissible.

    . . . .

    B.    Contrary to the Trial Court's Conclusion, Miranda Warnings Were Required; Absent these Warnings, the Fruits of the Police Investigation Were Inadmissible in the State's Title 9 Prosecution.

POINT II

HOSPITAL RECORDS OBTAINED IN THIS INVOLUNTARY FASHION, IN A CUSTODIAL SETTING, WERE NOT FOR DIAGNOSIS OR

13

TREATMENT AND ARE THEREFORE INADMISSIBLE. (NOT RAISED BELOW).

POINT III

EVEN IF THE PATERSON POLICE DEPARTMENT'S SEARCH AND INTERROGATION WERE LEGAL, AND HOSPITAL RECORDS ADMISSIBLE, [THE DIVISION] NEVERTHELESS FAILED TO PROVE [D.H.] ABUSED OR NEGLECTED HIS DAUGHTER WITHIN THE MEANING OF TITLE 9.

Both the Division and the Law Guardian urge us to reject defendants' arguments and affirm the judge's abuse and neglect finding.

## II.

We begin with a recitation of the governing principles. To succeed in a Title 9 fact-finding proceeding, the Division must prove "that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). An "abused or neglected child" is, in relevant part, a child under eighteen

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof[.]

14

[N.J.S.A. 9:6-8.21(c)(4)(b).]

A parent's failure to exercise a minimum degree of care "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Dep't of Children & Fams. v. T.B., 207 N.J. 294, 305 (2011) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999)). Willful or wanton negligence "implies that a person has acted with reckless disregard for the safety of others." G.S., 157 N.J. at 179. It is "done with the knowledge that injury is likely to, or probably will, result[,]" and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" Id. at 178 (citations omitted). "However, if the act or omission is intentionally done, 'whether the actor actually recognizes the highly dangerous character of [the] conduct is irrelevant,' and '[k]nowledge will be imputed to the actor.'" N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 144 (App. Div. 2016) (second alteration in original) (quoting G.S., 157 N.J. at 178).

"Because the primary focus is the protection of children, 'the culpability of parental conduct' is not relevant." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 344 (2010) (quoting G.S., 157 N.J. at 177).

> "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." G.S.,

157 N.J. at 181-82. "When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182. The mere lack of actual harm to the child is irrelevant, as "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citation omitted).

[S.G., 448 N.J. Super. at 144-45 (alteration in original).]

When evaluating these appeals, "our standard of review is narrow." Id. at 142.

> We will uphold a trial judge's fact-findings if they are "supported by adequate, substantial, and credible evidence." [N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)]. We "accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." [N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012)].
>
> . . . . No deference is given to the court's legal conclusions which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. K.G., 445 N.J. Super. 324, 342 (App. Div. 2016).
>
> [N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 218 (App. Div. 2019) (second alteration in original).]

16

If the trial court's rulings "'essentially involved the application of legal principles and did not turn upon contested issues of witness credibility,' we review the court's corroboration determination de novo." N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018) (quoting N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene . . . to ensure that there is not a denial of justice." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

In reviewing evidentiary rulings, "we afford '[c]onsiderable latitude . . . [to a] trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion.'" N.B., 452 N.J. Super. at 521 (alterations in original) (quoting N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016)). "An abuse of discretion 'arises when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Defendants challenge both the admissibility and the adequacy of the evidence relied on by the judge in concluding that S.B. was abused or neglected within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b).  As to admissibility, defendants contend that because Nouh's warrantless entry into D.B.'s apartment was not justified under the community-caretaking exception to the warrant requirement, Nouh's observations should have been suppressed under the exclusionary rule.

Under the community-caretaking doctrine,

> [c]ourts have allowed warrantless searches . . . when police officers have acted not in their law enforcement or criminal investigatory role, but rather in a community caretaking function.  In today's society, police officers perform "dual roles."  On the one hand, they carry out traditional law enforcement functions, such as investigating crimes and arresting perpetrators.  On the other hand, police officers perform a wide range of social services, such as aiding those in danger of harm, preserving property, and "creat[ing] and maintain[ing] a feeling of security in the community."
>
> [State v. Bogan, 200 N.J. 61, 73 (2009) (second and third alterations in original) (citations omitted).]

In Bogan, our Supreme Court recognized that the community-caretaking role of law enforcement "extends to protecting the welfare of children" and reflects "the State's general parens patriae duty to safeguard children from harm."  Id. at 75.  As a result, as long as the role was not "a pretext to conduct

18

an otherwise unlawful warrantless search," the Court would not "handcuff police officers from fulfilling a clear community caretaking responsibility, particularly one that might prevent imminent harm to a child, merely because the officers are engaged in a concurrent criminal investigation." Id. at 77. Thus, in Bogan, the Court concluded that a police officer did not "engage[] in an unlawful search" when the officer "had an independent basis, separate from any criminal investigation, to inquire whether a responsible adult was attending to [a child] and to ask a parent simple questions concerning a child's safety and welfare." Id. at 79. The Court held the officer "was lawfully on the premises . . . , and given the plain view doctrine, the police did not have to wait for judicial permission to question and eventually take [the] defendant into custody." Ibid.

However, without "some species of exigent circumstances, the community-caretaking doctrine is not a basis for the warrantless entry into and search of a home." State v. Vargas, 213 N.J. 301, 321 (2013). Instead, when exigent circumstances are present, "[p]olice officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement." Vargas, 213 N.J. at 323. The emergency aid doctrine "is derived from the commonsense understanding that exigent circumstances may require public safety officials,

such as the police, . . . to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury." State v. Hathaway, 222 N.J. 453, 469 (2015) (emphasis omitted) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)).

Under the emergency-aid doctrine, the State must show "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he [or she] provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched." Id. at 470 (first alteration in original) (quoting State v. Edmonds, 211 N.J. 117, 132 (2012)). Still, "[t]he emergency-aid doctrine . . . must be 'limited to the reasons and objectives that prompted' the need for immediate action." Edmonds, 211 N.J. at 134 (quoting Frankel, 179 N.J. at 599). "If, however, contraband is 'observed in plain view by a public safety official who is lawfully on the premises and is not exceeding the scope of the search,' that evidence will be admissible." Hathaway, 222 N.J. at 470 (quoting Frankel, 179 N.J. at 599-600).

While there are similarities between the emergency aid and community caretaking exceptions, the two exceptions are doctrinally separate and distinct. See Caniglia v. Strom, 593 U.S. ___, 141 S. Ct. 1596, 1598 (2021) (rejecting

that a police officer's "'caretaking' duties creates a standalone doctrine that justifies warrantless searches and seizures in the home"); see also State v. Witczak, 421 N.J. Super. 180, 192 (App. Div. 2011) (explaining that the community caretaking and emergency aid exceptions are "related, but separate exceptions[ that] have been used interchangeably in the past"). "The community [-]caretaker exception asks whether the police are 'engaged in "functions, [which are] totally divorced from detection, investigation, or acquisition of evidence relating to the violation of a statute."'" Witczak, 421 N.J. Super. at 192 (second alteration in original) (quoting State v. Navarro, 310 N.J. Super. 104, 109 (App. Div. 1998)). The emergency-aid exception focuses on an objectively reasonable belief an emergency exists, immediate action is needed to avert potentially serious harm to an individual, and there is a reasonable nexus between the emergency and the area to be searched. Hathaway, 222 N.J. at 470.

Here, police were dispatched to D.B.'s apartment after a neighbor reported a domestic dispute. Upon arrival, Nouh heard "[s]creaming, yelling, a lot of noise in the background, [and] a little girl's voice." After Nouh knocked, S.B. opened the door and revealed D.H. standing in the background "staring into thin air." Based on Nouh's confirmation that a domestic dispute was in progress, the fact that a child rather than an adult answered the door, and Nouh's observation

21

of a seemingly intoxicated male standing in the apartment, Nouh had a duty to enter the apartment to inquire whether a responsible adult was caring for the child and to ascertain whether the other party to the domestic dispute required immediate emergency assistance.

Police officers need not "'stand by in the face of imminent danger and delay potential lifesaving measures while critical and precious time is expended obtaining a warrant.'" Hathaway, 222 N.J. at 469 (quoting Frankel, 179 N.J. at 599). Under the circumstances, Nouh had "an objectively reasonable belief that immediate action was needed to avert potentially serious harm to an individual, and . . . delay in securing a warrant was not an option." Edmonds, 211 N.J. at 136. Nouh's warrantless entry into D.B.'s apartment was therefore equally justified under both the community-caretaking and the emergency-aid doctrine.

Once Nouh was lawfully inside, he observed the apartment in disarray with "empty heroin glassin[e] packets" in plain view and within S.B.'s reach. Nouh also observed "capped and uncapped" "syringes throughout the home." "We do not believe that a police officer lawfully in the viewing area must close his eyes to suspicious evidence in plain view." State v. Bruzzese, 94 N.J. 210, 237 (1983); see Hathaway, 222 N.J. at 470 ("If . . . contraband is 'observed in plain view by a public safety official who is lawfully on the premises and is not

22

exceeding the scope of the search,' that evidence will be admissible." (quoting Frankel, 179 N.J. at 599-600)).  "The question is not whether the police could have done something different, but whether their actions, when viewed as a whole, were objectively reasonable."  Bogan, 200 N.J. at 81.

We are satisfied that overall, the officers' "carefully modulated response" to "swiftly moving events and uncertain circumstances" was objectively reasonable.  Id. at 80.  Because Nouh was justified under the circumstances in entering D.B.'s apartment, his testimony about his observations once inside the apartment was admissible.  See Edmonds, 211 N.J. at 140 (explaining that the officers' entry into a home to assure the safety of a child following an anonymous 9-1-1 report of domestic violence was permissible under the emergency aid doctrine "[b]ut once there was no longer an objective basis to believe that an emergency was at hand, '[t]he privacy interests of the home [were] entitled to the highest degree of respect.'" (second and third alterations in original) (quoting State v. Evers, 175 N.J. 355, 384 (2003))); Bogan, 200 N.J. at 65 (upholding under the community-caretaking doctrine an officer's entry into an apartment to ascertain the welfare of a child who was home from school with no apparent excuse in a residence that had been the site of a reported sexual assault earlier that day).

Defendants also argue that the judge should have excluded their admissions as violative of their Fifth Amendment rights. Defendants contend their incriminating statements regarding illicit drug use were inadmissible because Nouh failed to administer Miranda warnings when the officers entered D.B.'s apartment.

"The Fifth Amendment privilege against self-incrimination, made applicable to the states through the Fourteenth Amendment, provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" State v. P.Z., 152 N.J. 86, 100 (1997) (alteration in original) (quoting U.S. Const. amend. V). "In New Jersey, the privilege is derived from the common law and is codified in our statutes and rules." Id. at 101; see N.J.S.A. 2A:84A-19; N.J.R.E. 503.

It is well established that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.
>
> [Miranda, 384 U.S. at 444.]

Thus, to trigger the need for Miranda warnings, "the defendant must be in custody and the interrogation must be carried out by law enforcement." P.Z., 152 N.J. at 102. "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." Id. at 103.

"[P]olice may conduct general on-the-scene questioning of a suspect, as authorized by Terry v. Ohio,[5] without giving Miranda warnings." State v. Toro, 229 N.J. Super. 215, 220 (App. Div. 1998). For example, in State v. Pierson, 223 N.J. Super. 62, 65, 67-68 (App. Div. 1988), the defendant was detained for thirty minutes at the scene of a fire investigation while police requested identification, asked why he was there, and then investigated his story. We explained that "[t]he investigative techniques adopted by the officer were neither harassing nor intimidating." Id. at 67. We concluded that "[a]s [the] defendant's restraint constituted a permissible investigatory detention rather than rendering him in custody, the absence of Miranda warnings did not preclude the

---

[5] Terry v. Ohio, 392 U.S. 1 (1968).

A-1628-21

evidentiary use of [the] defendant's responses to the officer's questions." Pierson, 223 N.J. Super. at 68.

In State v. Smith, 374 N.J. Super. 425, 431 (App. Div. 2005), we addressed "the applicability of Miranda warnings in the context of an officer's response to a call about a domestic dispute" by analogizing the situation to "field investigations" under Terry and "traffic stops" authorized by Berkemer v. McCarty, 468 U.S. 420 (1984). We "recogniz[ed] that police action subsequent to entering the residence is likely to involve some restraint on the occupants' freedom of action." Smith, 374 N.J. Super. at 431. However, we explained that "[d]espite the restraint on freedom of action involved in Terry and traffic stops, an officer is not required to give Miranda warnings before asking questions reasonably related to dispelling or confirming suspicions that justify the detention." Smith, 374 N.J. Super. at 431.

We saw "no basis for applying a different analysis or standard in determining the need for Miranda warnings when the police encounter with the person questioned begins with the officer's response to a call about a domestic dispute," and held that "[t]he fact that such an investigation typically takes place in the suspect's home away from the public view is not an inherently coercive circumstance." Smith, 374 N.J. Super. at 432. Thus, when police officers

26

respond to a domestic dispute call, "[t]he question is whether a reasonable person, considering the objective circumstances, would understand the situation as a de facto arrest or would recognize that after brief questioning he or she would be free to leave." Ibid. In Smith, we concluded that Miranda warnings were not necessary because "[t]he questioning was brief, lasting a matter of moments," "[was] related to dispelling or confirming the officer's suspicion," "[was] neither harassing nor intimidating," and "was not a stratagem or phrased to coerce an admission." Id. at 435.

Applying these principles, like the judge, we conclude that under the totality of the circumstances, Miranda warnings were not necessary. Nouh responded to D.B.'s home after a neighbor reported a domestic disturbance. When he arrived at the scene, Nouh heard yelling inside the apartment and a little girl's voice. After Nouh entered the apartment, by D.H.'s own admission, he was asked: "[D]o you live here?" "[W]hat are you doing here?" and "[W]ho is [D.B.] to you?" Based on Nouh's testimony, which the judge credited, the questioning occurred at the beginning of the encounter, prior to Nouh receiving supervisory approval to arrest defendants. "Custody at the time of questioning, from the perspective of the reasonable person, not the likelihood of future custody, is determinative." Smith, 347 N.J. Super. at 433.

As in Smith, Nouh's "questioning" of defendants was "brief," "related to dispelling or confirming [Nouh's] suspicion" that defendants were engaged in a domestic dispute and was "neither harassing nor intimidating." Id. at 435. Indeed, Nouh's questioning was "not a stratagem or phrased to coerce an admission," ibid., and the incriminating statements regarding illicit drug use were volunteered spontaneous admissions, see State v. Brabham, 413 N.J. Super. 196, 210 (App. Div. 2010) ("Miranda has no application to statements that are 'volunteered.'" (quoting Miranda, 384 U.S. at 478)). Thus, the evidentiary use of defendants' statements was permissible.[6]

Next, defendants challenge the admissibility of the medical records from their June 28, 2020, visit to St. Joseph's following their arrest as well as their statements recorded within the medical records. They assert their out-of-court statements made to medical personnel constitute inadmissible hearsay that was

---

[6] We need not consider and express no opinion as to the admissibility of D.B.'s incriminating statements to Beltran at the police station because they were not considered by the judge. See State v. Helewa, 223 N.J. Super. 40, 51-52 (App. Div. 1988) (equating Division caseworker to a law enforcement officer and requiring the caseworker to administer Miranda warnings to a parent who was arrested and confined during interview); State v. Flower, 224 N.J. Super. 208, 220 (Law Div. 1987), aff'd, 224 N.J. Super. 90 (App. Div. 1988) (suppressing a confession a defendant made to a Division investigator while arrested and confined in a county jail because the investigator failed to inform the defendant of his Miranda rights).

not subject to the medical-treatment exception to the hearsay rule, N.J.R.E. 803(c)(4), because the examination was not for purposes of diagnosis or treatment but for incarceration.

At the fact-finding hearing, D.B.'s medical record was admitted into evidence without objection. Therefore, we review the admissibility of D.B.'s medical record and her out-of-court statements embedded within the medical record for plain error. Plain error is any error that is "clearly capable of producing an unjust result." R. 2:10-2. "[A]n appellant faces an especially high hurdle in an appeal from a civil bench trial to establish that the admission of . . . evidence constitutes 'plain error.'" N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016). Indeed, "hearsay subject to a well-founded objection is generally evidential if no objection is made." Id. at 348-49. D.H.'s medical record was admitted subject to D.H.'s limited objection to the admission of any embedded hearsay. Therefore, we review the admissibility of D.H.'s medical record for plain error but review the admissibility of D.H.'s out-court-statements embedded in the medical record for abuse of discretion. See N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017).

Hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). Generally, "[h]earsay is not admissible except as provided by [the New Jersey Rules of Evidence] or by other law." N.J.R.E. 802. One such exception is the so-called business record exception, N.J.R.E. 803(c)(6), which excludes from the hearsay rule:

> [a] statement contained in a writing or other record of acts, events, conditions, and, subject to [N.J.R.E.] 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.

Thus, "[t]o qualify as a business record under N.J.R.E. 803(c)(6), a writing must meet three conditions: it must be made in the regular course of business, within a short time of the events described in it, and under circumstances that indicate its trustworthiness." State v. Kuropchak, 221 N.J. 368, 387-88 (2015) (citing State v. Matulewicz, 101 N.J. 27, 29 (1985)). Hearsay embedded in otherwise admissible business records "must satisfy a separate hearsay exception." J.D., 447 N.J. Super. at 347-48; see N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 466-67 (App. Div. 2014) (noting that notwithstanding the admissibility of Division records that meet the business records exception, hearsay embedded therein must meet other hearsay

exceptions in order to be admitted); N.J.R.E. 805 (providing that "[h]earsay within hearsay"—such as the content of a business record—"is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule").

Another pertinent exception to the prohibition against hearsay are statements made for the purpose of medical diagnosis or treatment. Such statements:

> (A) [are] made in good faith for purposes of, and is reasonably pertinent to, medical diagnosis or treatment; and
>
> (B) describe[] medical history; past or present symptoms or sensations; their inception; or their general cause.
>
> [N.J.R.E. 803(c)(4).]

Our Supreme Court has long recognized "the declarations of a patient as to his [or her] condition, symptoms and feelings made to his [or her] physician for the purpose of diagnosis and treatment are admissible in evidence as an exception to the hearsay rule." Cestero v. Ferrara, 57 N.J. 497, 501 (1971). The "rationale for that departure from the hearsay rule is that such statements possess inherent reliability because 'the patient believes that the effectiveness of the treatment he [or she] receives may depend largely upon the accuracy of the

31

information he [or she] provides'" the medical professional. R.S. v. Knighton, 125 N.J. 79, 87 (1991) (quoting Kenneth S. Broun et al., McCormick on Evidence § 292, at 839 (3d. ed. 1984)). Nonetheless, hearsay obtained during evidence gathering and medical consultations conducted purely in preparation for litigation remain inadmissible. State in the Int. of C.A., 201 N.J. Super. 28, 33-34 (App. Div. 1985).

Additionally, N.J.R.E. 803(c)(25) exempts party statements against interest from the general hearsay exclusionary rule. This includes statements by the party declarant which, at the time of its making, were contrary to declarant's "pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability . . . that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true." Id. "The statement-against-interest exception is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably. Consequently, statements that so disserve the declarant are deemed inherently trustworthy and reliable." N.T., 445 N.J. Super. at 498 (quoting State v. White, 158 N.J. 230, 238 (1999)).

Further, pursuant to N.J.R.E. 803(b)(1), a "[d]efendant's own statements are admissible as statements of a party-opponent" if the statements are offered

against him in the action.  J.D., 447 N.J. Super. at 348 (citing N.J.R.E. 803(b)(1)).  "[W]hen the proffered evidence is 'the [opposing] party's own statement,' there is no pre-condition to admissibility requiring a legal conclusion drawn by 'application of [the New Jersey] Rules of Evidence to adduced facts.'"  Konop v. Rosen, 425 N.J. Super. 391, 419-20 (App. Div. 2012) (citation omitted) (first quoting N.J.R.E. 803(b)(1); and then quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383 (2010)).  "The issue is purely a factual one—whether the party-opponent made the statement."  Id. at 420.

Guided by these principles, we discern no error and no abuse of discretion in the admission of the medical record as to either defendant.  The records were admissible under the business records exception to the hearsay rule, and the embedded hearsay was admissible under several other exceptions, including the medical diagnosis or treatment exception, as well as a statement against interest and of a party-opponent.  Although defendants were arrested prior to treatment, given their respective medical conditions, there can be no question that their statements about drug use were made to hospital personnel for the purpose of

diagnosis and treatment, and no credible dispute that the incriminating statements were made by the parties themselves.[7]

We reject defendants' suggestion that because they had already been arrested when they were being treated, hospital personnel acting in a law enforcement capacity had a duty to administer Miranda warnings. Defendants' proposition is unsupported by any legal authority. See Flower, 224 N.J. Super. at 218 (noting that "not all questioning . . . constitute[s] acting in a law enforcement capacity"). We also reject D.B.'s belated contention that her medical record was not properly authenticated. "[I]t is settled that circumstantial evidence is acceptable for authentication of written material." N.J. Div. of Youth & Fam. Servs. v. J.T., 354 N.J. Super. 407, 413 (App. Div. 2002).

Here, an attached certification stated that each defendant's medical record was signed by the director of medical records services. The certification also

---

[7] "Our conclusion that various embedded hearsay statements were evidential is not at odds with N.J.S.A. 9:6-8.46(b)(2), which states that 'only competent, material and relevant evidence may be admitted' in a fact-finding hearing. Hearsay does not relate to proof's relevance, see N.J.R.E. 401, or competence, see N.J.R.E. 601." J.D., 447 N.J. Super. at 350 n.5. "Indeed, based on the doctrine of invited error, inadmissible hearsay was deemed acceptable evidence in M.C. III, 201 N.J. at 342," to sustain a finding of abuse and neglect. J.D., 447 N.J. Super. at 350 n.5.

stated that the record had been "made in the regular course of business of th[e hospital]," that "it was in the regular course of business of th[e hospital] to make said records," and that "[t]he records were made at the time of condition and/or occurrences reported therein or within a reasonable time thereafter and accurately reflect[ed] the condition and/or occurrence." Such a certification from the records custodian provides satisfactory evidence and suffices to authenticate the records for purposes of N.J.R.E. 803(c)(6). See N.T., 445 N.J. Super. at 500 (holding that an "employee's certification" supported the admissibility of a record under N.J.R.E. 803(c)(6)).

Finally, defendants contend that even if all the evidence was admissible, it was inadequate to support the judge's finding of abuse or neglect.[8] D.B. asserts "[t]he record did no[t] contain sufficient credible evidence that [her] drug use . . . amounted to gross negligence that created imminent danger and a

_____

[8] Because we have decided that defendants' Fourth and Fifth Amendment rights were not violated in the circumstances of this case, we need not address whether the exclusionary rule even applies to a Title Nine proceeding. See Delguidice v. N.J. Racing Comm'n, 100 N.J. 79, 84, 92 (1985) (applying a balancing test to decide whether "application of the exclusionary rule [was] appropriate" and concluding "the Law Division's finding of entrapment and dismissal of criminal proceedings should not prevent the use of the incriminating evidence in appellant's licensing hearing before the Racing Commission"); see also P.Z., 152 N.J. at 112 ("We decline to tip the balance by requiring additional protections for the parents of abused children to be imported from our criminal jurisprudence into Title Nine proceedings.").

substantial risk of harm to [S.B.]," or that she "was impaired."  Similarly, D.H. argues the Division failed to produce "[a]dequate, substantial, credible, and competent evidence supporting any level of impairment, such that it impacted . . . [D.H.'s] ability to care for [S.B.]" or that he provided less than a minimum degree of care for S.B.

We reject defendants' contentions and affirm substantially for the reasons expressed in the judge's comprehensive August 31, 2021, oral opinion.  The judge's conclusion that defendants "failed to exercise a minimum degree of care" and placed S.B. in imminent danger and at substantial risk of harm was amply supported by competent and credible evidence.  In N.J. Div. of Child Prot. & Permanency v. V.F., we affirmed a finding of abuse or neglect within the meaning of N.J.S.A. 9:6-8.21(c)(4) predicated on two officers' testimony that the defendant was under the influence and unable to care for his minor children. 457 N.J. Super. 525, 537-38 (App. Div. 2019).  Based on their observations, the officers testified that the defendant "had blood shot eyes, was groggy, had slurred speech, was unable to provide coherent responses to simple questions, and had to use the wall for support while attempting to walk or stand on his own."  Id. at 537.  We rejected the defendant's contention that the proofs were deficient because the Division relied solely on the officers' observations and

"presented no physical evidence, such as blood or urine tests, to prove he was under the influence at the time" and there was no evidence "of drug paraphernalia in his house that would indicate drug use." Id. at 536-37.

Here, the evidence included Nouh's and Beltran's observations, defendants' incriminating statements to Nouh, and the contents of defendants' medical records. The proofs showed defendants were under the influence of "strong narcotics" while caring for S.B. and exposed S.B. to danger by allowing her to have access to drug paraphernalia, "including empty [heroin] glassines and capped and uncapped syringes." See N.J. Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 385 (App. Div. 2014) ("Parents who use illegal drugs when caring for an infant expose that baby to many dangers due to their impaired judgment.").

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1628-21